IN THE MATTER OF MARGARET HELENA KELBER, Helen Kelber and Violet Christiana Kelber.

STATE OF NORTH DAKOTA, Respondent, v. HENRY KELBER, Bertha Kelber, Margaret Kelber, Helen Kelber and Violet Christiana Kelber, Appellants.

(200 N. W. 786.)

**Infants — order permanently depriving parents of the custody of their children held erroneous.**

In a proceeding under the Juvenile Court Act to take from parents the cus-

tody of children on the ground of neglect, it is held, for reasons stated in the opinion, that the children were not neglected, within the intent and meaning of the law, and that it was error to permanently deprive the parents of their custody.

Opinion filed November 6, 1924.

Infants, 31 C. J. § 236 p. 1108 n. 96.

Appeal from the District Court of Richland County, before *Wolfe, J.*

Reversed.

*Purcell & Slattery,* for appellant.

It is generally held that when an infant is made a party to an action, he must be served with process. 31 C. J. chap. 320, under Infants, 1150, note 36, citing U. S. Ala. Ark. Cal. Fla. Ga. Ill. Ind. Ia. Ky. Md. Miss. Mo. Neb. N. Y. N. Car. Ohio, Okla. S. Car. S. Dak. Tenn. Tex.

Before the appointment of a guardian ad litem for any defendant, the general rule is that there should have been service of process upon the defendant as is necessary to bring him within the jurisdiction of the court. 31 C. J. chap. 278, under Infants, p. 1130, citing Ala. Ark. Cal. Fla. Ga. Ind. Ill. Ia. Kan. Ky. Minn. Miss. Mo. Ohio, Okla. S. Car. Tenn. Tex. Wis

The legal representative of an infant in making defense to an action was called in the common law, guardian ad litem and this term is preserved in modern practice. In every criminal prosecution action at law or in equity, or special proceeding in which an infant is defendant, it is the duty of the court to appoint for him a guardian ad litem; at least in the absence of a general guardian; and until this is done, he cannot make a legal defense nor can any steps in the action be taken against him. 14 R. C. L. chap. 52, under Infants, page 282, note 12, citing Ill. Me. Mass. Mo. Ohio, Va.

The fact that the law prescribes a special method of defense by an infant defendant, does not dispense with the regular service of process against him in beginning the action. Indeed the court has no jurisdiction to appoint a guardian ad litem unless the statutory requirements as to service have been complied with. An infant can neither acknowledge or waive the regular service of process upon him. 14 R.

C. L. chap. 53, under Infants, p. 284, citing Ala. Fla. Ill. Ia. Kan. Ky. Mass. Mo. N. Y. N. Car.

A statute requiring process against an infant to be served on his father, mother or guardian, is not complied with by service on the parent in his capacity as defendant only; where the parent is also a party defendant, he must be specially served for the infant in order to bring the latter before the court. 14 R. C. L. chap. 53, under Infants, 284, note 8.

It is held in most of the cases that the lack of service on the infant is a fatal, because jurisdictional, defect, and cannot be cured by the appointment of a guardian ad litem, and is making actual defense for the infant; and this ruling seems consistent with the lack of power on the part of the guardian to bind the infant by his admissions or stipulations. 14 R. C. L. chap. 53, page 285, notes 11 and 12, citing Ill. Ky. Mo.

Service of summons upon an infant defendant in the mode authorized by the statute must precede the appointment of a guardian ad litem for him, and though such guardian be appointed, and he appears and represents the interests of the minor, the appointment and all subsequent proceedings in the action, including the final judgment are void, as against the infant not served with process or summons. Phelps v. Heaton (Minn.) 82 N. W. 990.

W. L. Divet, State's Attorney, and John Thorpe, Assistant Attorney General, for respondent.

The matter of the guardianship of minor children, on their father's petition to vacate an order of the county court depriving him of their custody, was in the circuit court, not to review the action of the county court, but for trial de novo, and the circuit court had all the power which the county court might have exercised. Re Skowran (S. D.) 172 N. W. 806.

A finding of fact by the trial court in a mandamus proceeding will not be set aside on appeal if supported by any credible testimony. State ex rel. Trimble v. Minneapolis, St. P. & S. Ste. M. R. Co. 28 N. D. 621.

Where either a law action or a special proceeding is tried by the court, the findings of the court have exactly the same weight as the verdict of a jury and must be given the same weight in this court.

Jasper v. Hazen, 4 N. D. 1; Dowagiac Mfg. Co. v. Hellekson, 13 N. D. 257; Ruettel v. Ins. Co. 16 N. D. 546; James River Nat. Bank v. Weber, 19 N. D. 702; State Bank v. Maier, 34 N. D. 259; Novak v. Lovin, 33 N. D. 424.

In such case, this court will not substitute its judgment for the judgment of the trial court as to the facts, but will simply look into the testimony to ascertain whether there was any substantial evidence to sustain the findings. In other words, in such case, this court will treat the findings of fact of the lower court exactly as it would treat the verdict of a jury had the case been tried by a jury. This court will not review the evidence in this case with a view of determining its weight, but simply to ascertain whether or not there was sufficient legal evidence to support the verdict or findings. Taylor v. Jones, 3 N. D. 235; Clemens v. Royal Neighbors, 14 N. D. 116; Houghton Imp. Co. v. Vavrowski, 125 N. W. 1024; Hall v. N. P. R. Co. 16 N. D. 60; Casey v. First Nat. Bank, 126 N. W. 1011; Olson v. Day, 23 S. D. 150; Grand v. Powers Dry Goods Co. 23 S. D. 195; Jackson v. Grand Forks (N. D.) 140 N. W. 718; Reed v. Ehr, 36 N. D. 552.

It is finally urged that the statute of 1899 is unconstitutional for the further reason that it invests the "court with powers to try the right of the liberty of any child under the age of 15 years without the service of a summons, a warrant, or process of any kind upon such child." The statute provided a hearing by the court after notice shall have been served upon the parent or person having the actual custody or control of the child. It is not essential that the law should be further extended so as to provide for notice of the infant in a proceeding to have the custody thereof committed to the guardianship and control of the board. See Board v. Shutter, 31 L.R.A. 740; Gibson's Appeal, 28 N. E. 296; Kurtz v. Railroad Co. 51 N. W. 221; Reynolds v. Howe, 51 Conn. 472. In Van Walters v. Board, 32 N. E. 568, the validity of the Act of 1899 was upheld. This court in that case said: "The statute violates no constitutional principle, inasmuch as it guards the interest and rights of parents by requiring that their children should not be taken from them without a hearing, upon due notice, in the courts of this state." Wilkinson v. Board (Ind.) 62 N. W. 481.

JOHNSON, J. This is an appeal from an order of the District Court

of Richland County made on the third day of March, 1924, refusing to vacate and set aside a former order of the court made on December 20, 1923, wherein it was adjudged and decreed that the three minor children of the defendants, Margaret, Helen and Violet are neglected children, within the meaning of the laws of this state, and appointing Frank D. Hall, Superintendent of the North Dakota Children's Home Society, as guardian of said children and directing and authorizing him to take them from the custody of their parents and place them in a family home or in such other suitable place as may be provided. Hall was also authorized to consent to the legal adoption of the children within the state. The order, in effect, takes the children from their parents permanently, appoints a guardian for them, who is authorized to consent to their permanent adoption into any suitable family within the state. The appellants challenge the legality of this order and contend, upon the merits, that the court exceeded its authority in taking the children from them and in authorizing a guardian, appointed by the court without the parents' consent, to arrange for their adoption.

The defendants, Henry Kelber and Bertha Kelber, were married in Iowa in 1911, and, during substantially all of the intervening time, have lived on a rented farm of 160 acres in Richland County. The record shows that Kelber had stock on the farm, consisting of horses, cows, hogs, chickens, turkeys and geese and that he had adequate farm machinery for his needs. The oldest child, Margaret, was, when these proceedings were commenced, 7 years old; the second child, Helen, was 4 years old and the youngest, Violet, was 10 months old. The house in which the family lived was apparently a small farm house, partitioned into two rooms, with two beds in one of the rooms. The record shows that the wife and the children occupied one bed and the husband a lounge or couch.

One Adelaide Price, school nurse of Richland County, some time in the fall of 1923, visited the home of the Kelbers. There had been some difficulty between the Kelbers, husband and wife, owing to her lack of tidiness. It seems that Mr. Kelber was not satisfied with the manner in which she kept house and that this occasioned domestic discord which had culminated in a resolution on the part of Mrs. Kelber to leave the home and procure a divorce. It is this domestic situation which, at least to some extent, explains the request made by the father

to the visiting nurse to advise him where the children could be cared for. The father maintained that he always understood that this arrangement would be only temporary and that the children would be restored to him. It appears that he offered and desired to pay whatever was reasonably necessary to care for the children until other arrangements could be made by him.

It is upon the testimony of Adelaide Price that the conclusion of the trial court largely rests. He also saw the family. It will be necessary to consider her testimony in some detail. She testifies that for more than six years she had been the school nurse of Richland County; that more than two years ago she received a letter from some society urging that she investigate conditions in the Kelber home; that she went to the Kelber home in October or November, 1923; that she did not go into the house that day but was in the door and looked into the house and was able to see some of the interior. On being asked as to conditions, she says: "It was the worst place that I have ever entered. It was very, very dirty, not only the floor, but the beds and bedding, the table and food that was around. Every part of the house was indescribably dirty." The furniture she describes as follows: One pullout cot or bed lounge, not full size; "in the kitchen or one of the rooms I would say a very small kitchen table, not regular size; a heater, a cream separator, an oil stove and two chairs in the room. In the next room were a sort of cupboard and a bed." She testifies further that on the first visit she discussed the condition of Margaret's eyes and asked him what he proposed to do to "better the condition of the children." The witness says that the father told her that he intended to take Margaret to his sister and that he asked her what he should do about the other children, to which the witness said she answered that she would "try to find out." The witness further testifies: "He said Mrs. Kelber said she was going to leave him and he asked me and urged me to find out if there was some place where the children could be taken care of. I told him that I did not know, without it would be the Fargo Home, that I did not know the law and did not know the method of getting children into that home but I would find out for him." As to whether the Kelbers could get their children back, this witness said she informed them that she did not know anything about the law on that point. The witness further testified that the father told her he in-

tended to bring his sister to keep house for him. This is virtually all of the testimony of the state's witness on direct examination. On cross examination she testified that she went into the bedroom, but did not touch the bed clothes and did not lift them up or lift up any part of the bed. Neither did she touch the baby. She says, on cross examination, that "the baby was in a bundle of filthy rags." She did not examine the older child, Helen, who was at home when she made the investigation, nor did she inspect the child's clothing. She says that "her outside clothing" was torn and hanging down and she says that she based her conclusion that the children were neglected on what she saw on that occasion. The complaining witness on cross examination stated that she did not think at all of the suggestion by the father that his sister would come and keep house for him and that she "didn't look into that part of it." On being examined by the court, the complaining witness stated that at the first hearing, on December 20, 1923, the Kelbers, and particularly the father, understood from the conversation that if the children were taken into the home in Fargo he could not get them back and that he assented to that arrangement, apparently with a full understanding that he could see the children so long as they were in the home, but if they had been adopted or placed in family homes he could not see them. She also told the court that at the hearing it appeared that the Kelbers had quarreled, that Mrs. Kelber was going to her father and that she would have done better as a housekeeper if her husband had left her alone.

Frank D. Hall was called as a witness for the state. He is the superintendent of the North Dakota Children's Home Society and was present at the hearing on December 20, 1923. At that hearing the Kelbers were not represented by counsel. The witness Hall corroborated the testimony of the nurse as to the conversation at the time of the hearing. The witness said he advised the father that the Home did not board children and could not take them in on such terms. The witness advised Kelber that he could visit the children so long as they were in the home, but if they were placed the names and residence of adoptive parents would not be divulged and he would not be permitted to see them. The witness did not recall that anything had been said about the children being better off if taken from their parents. The court then examined the witness as to the appearance of the chil-

dren at that hearing. The witness said: "Well, I don't know that I can describe the dresses in particular, but they were very dirty, very dirty. And Mrs. Kelber's dress was dirty. They were not in the same clothing in which they appeared here today, by a long ways, either of them. I gained the impression that Mr. Kelber was perfectly sincere and honest in his attempts to have the children better taken care of and I believe he did all he was capable of doing. I believe he loves these children and I don't blame him at all for wanting them back. At the same time I don't feel that it would be the wise thing to do. That is a matter for the court to decide and not me." The witness then said that the shoes and stockings were in "bad condition;" that he had inquired of the mother about keeping the baby clean and been informed that the baby had been bathed the day before. "I saw from that that she was taking the best care she could of the baby." It appears that the mother told him on that occasion that she had not given the other two girls a bath for about two months, apparently. This is explained by the parents as due to the cold weather and the cold house, which was not then in good condition, neither as to the floor nor otherwise. The mother complained to this witness that she had no spending money and nothing to "do with" to keep the house clean. On cross examination the witness stated that he discovered no vermin on the children, but that their faces, their hands and necks were dirty. He further said that he saw nothing peculiar about their clothing and that he "didn't notice anything except the general dirty condition of them. . . ." The witness further said: "I would say that they hadn't been washed that day, but it might have been that the dirt and dust coming in might have been responsible for it." Testifying with reference to the baby, the witness said: "The baby was in ordinary condition; it was dressed like a baby from an ordinary nice home in town." He said that he presumed that the children had had plenty to eat and plenty to wear, such as it was, altho the house physician, after examining them, reported that they were under-nourished. The witness said he did not know on what the physician based his conclusion; that a good many children are under-nourished and still live with their parents. The witness said that he would be able to comply with any order of the court with respect to the custody of the children.

The evidence in behalf of the parents on the second hearing shows

that neither one of them is morally delinquent in any degree; that neither one of them uses intoxicants or drugs of any kind. There is no testimony that either parent uses profane, obscene or objectionable language at home or in the presence of the children. Both parents attend church. Several neighbors testified. One said he helped "fix up" the house and that he knew "lots" of worse places where children were being raised. All of them testified to the effect that the husband was an industrious, hard-working farmer, who attended to his business in the community and apparently did the best he could to bring up his family. Several of the neighbors who testified on that point said that they had noticed the children many times and that they did not appear to be dirtier or worse kept than children in the country ordinarily are who play in the dirt and who live in homes of small or moderate means. We do not believe it is necessary to go into detail in giving the testimony of these witnesses. All the testimony indicates that the husband and father has done his best and has worked hard to support and properly raise his family, and that there is nothing in the home, in the home surroundings, or in the habits of either parent calculated to undermine the moral constitution of the children or to direct their development into immoral or vicious channels. It is unquestionably true that the mother was careless in keeping the children clean and tidy and in keeping the house clean. The youngest child was, at least at times, fairly well cared for; indeed, the witness Hall, testifying for the state, says that the baby was dressed like one "from an ordinarily nice home." There is no evidence in the record on which a finding can be based that the ch⋯⋯ en suffered neglect either in food or clothing, sufficient to warrant a court in permanently depriving the parents of their custody. The children did not beg nor were they guilty of any immoral practices or of conduct tending in any manner to affect or undermine their moral nature. On the occasion of the visit of the complaining witness to the home she testifies that she found the place "indescribably dirty," but she does not give details or particulars. It must be clear that this is merely her conclusion. There is no doubt that it so seemed to her, but she was not an officer of the court; nor did she submit findings or give facts, otherwise than as heretofore stated, on which the court could rely in forming a judgment.

The proceedings in this case were had under chapter 177, Sess. Laws

1911, as amended by chapter 179, Session Laws, 1915, being §§ 11,402–11,428, Comp. Laws, 1913, commonly known as the Juvenile Court Act. Chapter 179, Session Laws, 1915 was again amended in 1921 (chap. 83, Session Laws, 1921).

There are no findings in the record other than the recitals in the order dated December 20, 1923. The proceedings were initiated upon the petition of the county school nurse. The filing of that petition was, as she herself says, somewhat beyond the scope of her duties. A summons was issued on the petition and the Kelbers appeared pursuant thereto, without counsel or legal advice from any private, or professional source. It is contended that the proceedings were wholly irregular, but we are not disposed to decide this case upon any mere technicalities of practice or procedure. It is evident that all the parties who were concerned in the proceedings that culminated in the order taking the children from the Kelbers and authorizing their legal adoption, acted in the utmost good faith and in what they conceived to be the best interests of the children.

We are satisfied, upon careful consideration of the testimony and the exhibits in the case, that the order of the trial court, made December 20, 1923, was reasonable and proper, *under the circumstances then existing*. There is only one point on which we might entertain some doubt and that is whether the father realized clearly, at that time, that he consented to an arrangement that would deprive him of the society and custody of his children forever and place them in homes never to be made known to him and where he would not be permitted to visit or see them. Both parents deny any such understanding of the situation. The father says he understood that he could get them back when he had made the proper arrangements which he anticipated would be made necessary by the contemplated departure and divorce of his wife. It is true that at the second hearing the parents were endeavoring to recover the custody of their children and, therefore, had the strongest motive that may influence human conduct to disclaim a full understanding of the legal consequences of their acts, for "What gift has Providence bestowed on man that is so dear to him as his children?" Some corroboration of the plaintiffs on this point, however, is found in the letter of the superintendent of the Fargo Home, dated January 15, 1924, to the father, where Mr. Hall says: "I think you do not under-

stand that when Judge Wolfe turned the children over to the Children's Home, it was with his instructions to give them out to family homes for adoption." This was more than three weeks before proceedings were commenced to vacate the original order. Be that as it may, the record clearly shows that when the first hearing was had, domestic disharmony had to such an extent entered the Kelber home that the wife was ready to leave, with the intention of later obtaining a divorce, and the father was not so situated that he could alone take care of the children and do the work on the farm. Whether the parents fully realized that they were never more to see their children may be doubted, but need not now be decided, because we are of the opinion that the trial court erred when it made the order denying the application of the parents to have the first order vacated and the custody of the children restored to them.

When the second hearing was had, on February 20, 1924, conditions had materially changed in the Kelber home. Mrs. Kelber's father had died; she inherited $2,500.00 or $3,000.00, by reason thereof; the house on the farm had been put into condition and the floor therein repaired. There had been effected a reconciliation between husband and wife. Both were anxious to have the children returned and both expressed a purpose to give them better care than they had had theretofore. See Re Knowack, 158 N. Y. 482, 44 L.R.A. 699, 52 N. E. 676. There is no claim that the children were in immoral surroundings or that the circumstances of the family were such that moral degeneracy was feared or anticipated. The parents may not be blessed with intelligence of the highest order, nor with a high degree of education or culture. The law, however, makes no distinction between the genius and the common man, the educated and ignorant, the refined and the uncouth, the rich and the poor, insofar as the natural right to the custody of offspring is concerned. Every consideration of justice and humanity requires that family ties shall not be lightly sundered. It is undoubtedly the law that the state may sever the family tie, may separate forever parent and child, when the welfare of the ward is enhanced by such a course. The interest of the child is the paramount consideration; Re Sidle, 31 N. D. 405, 154 N. W. 277. It may, however be postulated, without proof or discussion, that it would promote neither the public interest nor the child's welfare to scatter families

to the four winds of heaven except in emergencies of the gravest character. The home and the family, held together by the ties of natural, rather than adoptive, affection, is the last bulwark of American institutions. Poverty, lack of education, or of culture alone are never sufficient justification for severing the ties that bind families together. In this western country, on these western plains, many a home might have been broken where large families were raised by the pioneers in one room cabins of logs, or sod, had poverty, lack of education, or begrimed faces of children, playing on naked mother earth, been the only showing required. In a recent case, very similar in its facts to the one here and under analogous statutes, the Superior Court of Pennsylvania said:

"The great bulk of evidence seems to show that there was really nothing wrong with the children who are the subject of this complaint except that they were dirty and not well groomed. . . . It was not the purpose of the statutes now in force in Pennsylvania to prescribe just how often in a week a child should be scrubbed. Within the writer's knowledge a generation of vigorous men and women have grown up under conditions that would not meet the approval of some of the witnesses of the Commonwealth." Com. ex rel. Bickel v. Bickel, 78 Pa. Super. Ct. p. 351.

It by no means follows that a child's welfare is always necessarily promoted by removing him from a home of poverty and hard work and transplanting him in another home of luxury and ease. See Re Sidle, supra.

The testimony of the superintendent of the Children's Home is that the children have not been legally adopted and that he is in a position to comply with any order of the court as to their custody. The welfare of the children, as the wards of the state, being the paramount consideration, there seems no question but that the state can, thru the agency of the courts, transfer their custody to the parents. We think the trial court should have granted the motion to vacate the order of December 20, 1923, and that it should have restored the custody of the children to the parents under such supervision or periodical visitation as the court deemed necessary in the circumstances.

The judgment is accordingly reversed, and the case remanded with direction that judgment be entered not inconsistent herewith.

BRONSON, Ch. J., and NUESSLE, CHRISTIANSON, and BIRDZELL, JJ., concur.