Lynne JACOBSON, Director, Stark
County Social Service Board,
Petitioner and Appellee,

v.

V. S. and G. S., Respondents
and Appellants,

and

L. R. S., a child, and Lynne Jacobson,
Director, Stark County Social Service
Board, Respondents.

In the Interest of L. R. S., a child.

Civ. No. 9467.

Supreme Court of North Dakota.

Oct. 31, 1978.

---

Donald L. Jorgensen, Asst. State's Atty., Dickinson, for petitioner and appellee.

Freed, Dynes, Malloy & Reichert, Dickinson, for respondents and appellants; argued by Ronald A. Reichert, Dickinson.

ERICKSTAD, Chief Justice.

The parents of L.R.S., a seventeen-month-old girl, appeal from a juvenile court order that found their daughter to be a deprived child pursuant to Chapter 27–20, N.D.C.C., and placed the child under the care, custody, and control of the Stark County Social Service Board. We affirm.

L.R.S. (whom we shall refer to hereinafter as Laura, a pseudonym) was born prematurely in a Bismarck hospital on May 27, 1977, and remained in the hospital in intensive care for two months. During this time, the Stark County Social Service Board provided financial assistance to the 16-year-old mother to allow her to travel to Bismarck to receive training in the feeding and care of her child. After Laura was released from the hospital, she and her parents resided in Dickinson, North Dakota.

On December 2, 1977, a Report of Child Abuse and Neglect was filed with the Stark County Social Service Board concerning an incident that allegedly occurred on November 30, 1977, in a local motel. The report, filed by a waiter at the motel's restaurant, stated that Laura and her father (G.S.) were in the restaurant at approximately 2:00 a. m. on November 30, 1977, and that Laura was improperly clothed. The report also stated that G.S. was intoxicated and that he fell while holding Laura.

On December 15, 1977, the Social Service Board received a second report regarding Laura from Kathleen Engraf supported by her affidavit saying essentially that G.S.

brought Laura to Ms. Engraf's apartment on December 15, 1977, at approximately 6:30 a. m. requesting that she take care of Laura. G.S., who appeared to be intoxicated, allegedly attempted to feed Laura from a baby bottle and when Laura would not drink he threw the bottle against the wall. The bottle apparently bounced off the wall and struck Laura on the forehead. G.S. then grabbed Laura, allegedly intending to strike her, when Ms. Engraf took Laura and left the apartment.[1] Ms. Engraf subsequently telephoned the Stark County Social Service Board, who picked up Laura and applied to juvenile court for an order for temporary custody of the child.

Stark County Juvenile Court issued an order for temporary custody on December 16, 1977, (effective for 30 days) placing Laura under the care, custody, and control of the Stark County Social Service Board. Laura was admitted to the hospital for examination on December 15, 1977, and remained hospitalized for nine days.

The petition was subsequently filed with the juvenile court by the director of the Stark County Social Service Board to have Laura declared a deprived child, and a hearing was set for December 23, 1977, by order of the juvenile court. On December 23, 1977, the parties appeared in juvenile court and stipulated to a continuance of the hearing, which was later scheduled for January 26, 1978. Laura remained under the care, custody, and control of the Stark County Social Service Board, but was placed in the parents' home on December 24, 1977. The Stark County Social Service Board conditioned the placement with the parents upon three conditions: (1) the parents were not to consume alcoholic beverages, (2) the parents were not to leave Dickinson without informing the Social Service Board, and (3) only the parents were to care for Laura.

On December 31, 1977, the Dickinson police called the director of the Social Service Board and informed her that a desk clerk

from a local motel was there with a baby that was later identified as Laura. Apparently, Ms. Engraf had asked the clerk to care for Laura while her parents and Ms. Engraf made a trip out of town. The desk clerk did not know the child or the parents, but she did know Ms. Engraf who had asked her to babysit. The clerk had expected them to return before 5:00 p. m. when she went off duty, and when they did not return, she went to the police at approximately 7:00 p. m. The parents and Ms. Engraf had allegedly left town to obtain some milk for the baby and allegedly had car trouble. Laura was subsequently placed in foster care until the hearing on January 26, 1978.

Following the hearing on January 26, 1978, the juvenile court issued its order in which it found Laura to be a deprived child and placed her under the care, custody, and control of the director of the Stark County Social Service Board for placement in a suitable foster home for two years. The order also provided that the Social Service Board place Laura with the parents if they acquired the capability of caring for her. Notwithstanding, it provided that Laura remain under the care, custody, and control of the Social Service Board for the two-year period, or until the further order of the court.

The parents appeal from the juvenile court's order to this court.

Before we discuss the issues in this case, we shall set out some general principles of law applicable in deprivation cases.

Section 27–20–02(5)(a), N.D.C.C., defines a deprived child as one who:

"Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means

---

1. Ms. Engraf did not testify at the hearing on the petition and her affidavit of December 15, 1977, was not admitted into evidence by the juvenile court. Consequently, we have not considered Ms. Engraf's affidavit in making our

decision. The information contained in the affidavit is included herein to show the basis for the petition of the director of the Social Service Board.

of his parents, guardian, or other custodian . . . ."

We have interpreted the term "proper care" to mean that the parents' conduct in raising their children must satisfy the "minimum standards of care which the community will tolerate." *In Interest of K. P.*, 267 N.W.2d 1, 3 (N.D.1978); *In Interest of R. H.*, 262 N.W.2d 719, 724 (N.D.1978). Evidence that compares the child-rearing skills of the natural parents and the foster parents will not alone support a finding of deprivation if the parents' efforts meet the minimum standards of care. *Interest of R. D. S.*, 259 N.W.2d 636, 638 (N.D.1977). We have also recognized that the lack of cleanliness of the home alone does not establish deprivation. *In Interest of R. H.*, 262 N.W.2d 719, 724 (N.D.1978); *In re Kelber*, 51 N.D. 698, 709, 200 N.W. 786, 789 (1924). Similarly, the finding of poverty or lack of education or culture is not sufficient. *Bjerke v. D. T.*, 248 N.W.2d 808, 813 (N.D.1976); *In re Kelber, supra* at 789.

▮ It is well-established that parents have a constitutional right to the custody and companionship of their children. *In re J. Z.*, 190 N.W.2d 27, 29 (N.D.1971). This right is not absolute, however, and parents are not entitled to custody of their children under all circumstances. *Interest of R. D. S., supra* at 638; *Bjerke v. D. T., supra* at 811. Parents are entitled to a presumption that they are fit parents and the burden of disproving this presumption of parental fitness is on the challenger. *Bjerke v. D. T., supra* at 811. It is also clear that deprivation must be shown by clear and convincing evidence. *Bjerke v. D. T., supra* at 811.

▮ Our scope of review in a deprivation proceeding is broader than in other cases tried to this court. Although we give appreciable weight to the finding of the juvenile court, we are not bound by the "clearly erroneous" rule of Rule 52(a), N.D.R.Civ.P., and are allowed to re-examine the evidence in a manner comparable to the former trial de novo. *Bjerke v. D. T., supra* at 811; *In Interest of M. L.*, 239 N.W.2d 289, 291 (N.D. 1976).

▮ We have noted our reluctance to remove a child from the parents unless "diligent effort has been made to avoid such separation", and unless it is necessary to prevent serious detriment to the welfare of the child. *Bjerke v. D. T., supra* at 814. We have also noted our sensitivity to the argument that it is dangerous to allow social workers to determine how a family is run. *Bjerke v. D. T., supra* at 814.

Before we attempt to determine whether or not the juvenile court erred in concluding that Laura is a deprived child pursuant to Chapter 27–20, N.D.C.C., it is necessary to consider a number of procedural objections raised by the parents.

▮ The parents contend that they requested all information in the files of the Social Service Board relating to this case ten days before the hearing on the petition, and did not receive any information until late afternoon the day before the hearing. The records of the Social Service Board allegedly contained results of medical and other tests performed on Laura, as well as "allegations of subsequent detrimental courses of conduct" by the parents. The parents argue that they failed to receive this information in time to sufficiently prepare a defense and therefore were denied due process of law. The petitioner argues that the records in this case, although not sent to the parents, were at all times available to them, and, in any event, that the petitioner was agreeable to a continuance if the parents so desired, upon condition that Laura continue to be under the custody of the Social Service Board pending the outcome of the hearing. When the parents declined the continuance, they waived any objection. That they waived the right to a continuance is supported by the transcript:

"THE COURT: Are you asking for a continuance?

"MR. REICHERT: No I am certainly not asking for a continuance. I am questioning whether the Court can grant it. The statute indicates you can take temporary custody of this child for thirty days and when that thirty days expires the child has to be given back. The thirty

days has passed based on the agreement of counsel and I want the record to indicate the prejudice that I am working under.

"THE COURT: You can't have your cake and eat it too. You can't ask the Court to set the basis for error in this case and if you do need a continuance to prepare for trial I will grant it Mr. Reichert. If you are prepared to go to trial we will go ahead.

"MR. REICHERT: We will continue."

The parents also argue that the juvenile court erred by allowing "evidence, circumstances and situations completely outside of the pleadings." They argue that they were prepared to defend against the incidents stated in the petition, and that when the juvenile court admitted evidence of facts outside of the petition, they were denied due process and effective assistance of counsel. The parents refer the court to *Alsager v. District Court of Pope County, Iowa*, 406 F.Supp. 10 (S.D.Iowa 1975), *aff'd* 545 F.2d 1137 (8th Cir. 1976), for the proposition that "parents [must] be notified, in writing, of the specific charge or factual allegations . . .." 406 F.Supp. at 25, citing *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). We think that *Alsager* is clearly distinguishable from this case. *Alsager* was a termination of parental rights case and the only notice the parents received in that case was a copy of the petition that merely paraphrased the language of the parental termination statute. The petition did not contain any "allegations of abuse, mistreatment or parental failings."

We have not previously considered the question of whether or not a petition to juvenile court alleging deprivation must be continuously amended to include incidents of alleged deprivation that have occurred following the filing of the petition for evidence of that nature to be received.

*In Interest of T. M. M.*, 267 N.W.2d 807, 813 (N.D.1978), we noted that a deprivation petition that only contained the statutory definition of "deprived child" (§ 27–20–02(5)(a), N.D.C.C.) did not comply with the requirement of Section 27–20–21, N.D.C.C. that requires a petition to "set forth plainly . . . [t]he facts which bring the child within the jurisdiction of the court . . .." We held that "such facts are necessary in order to provide notice to respondents, so that they may prepare for the hearing and participate meaningfully in it."

In *Interest of M. L.*, 239 N.W.2d 289 (N.D.1976), we said that "due process requires notice of a hearing and of the general nature of the issues to be heard and an opportunity to prepare." 239 N.W.2d at 295. *See also In Interest of R. H.*, 262 N.W.2d 719, 722 (N.D.1978).

In this case, the petition does contain facts that "bring the child within the jurisdiction of the court." The parents argue, however, that they did not have proper notice of, and were not prepared to defend against, the incident of December 31, 1977, because it occurred 15 days after the petition was filed. Our examination of the petition convinces us that the parents were informed of the nature of the complaint and of sufficient facts, notwithstanding that not all of the facts upon which the court relied were contained in the petition. Furthermore, counsel for the parents received the records in this case from the Social Service Board. This incident was referred to in those records and, as noted earlier, counsel could have obtained a continuance to defend against the implications of those records had he so desired. Without deciding whether or not amendments to a deprivation petition may be required in some instances, we hold that under the circumstances of this case a formal amendment to the petition was not necessary and that the parents had adequate notice, or that by declining to accept a continuance, they waived the right to more adequate notice. The parents were not denied due process or effective assistance of counsel.

The parents also object to the receipt of the contents of certain conversations between themselves and the persons investigating a child abuse and neglect report on the ground that they were not advised of their right to counsel at the time of the

conversations. Although the parents do not state whose testimony they are objecting to, it appears from reviewing the transcript that the questioned testimony is that of Kerry Kingsley, a public health nurse, and Kate Hanson, a social worker. The facts are that Ms. Kingsley and Ms. Hanson went to the parents' home on December 9, 1977, to investigate the child abuse and neglect report filed on December 2, 1977. The parents were questioned generally about Laura's feeding habits, the kind of child she was, and her health.

In *Interest of R. W. B.*, 241 N.W.2d 546, 555 (N.D.1976), we dealt with a similar question. In *R. W. B.*, the parents were interviewed by a representative of a social service board in a parental rights termination case. During the interview, the parents were asked generally who cared for the child and how the child's injuries were sustained. We held that, under the circumstances, the parents were entitled to be advised of their right to counsel pursuant to Section 27–20–26(1), N.D.C.C. We went on to hold, however, that the failure to so advise them was not prejudicial error:

> "We have examined the record and conclude that it was not prejudicial error to permit Mrs. Dybwad [social service representative] to testify about the conversation she had had with M.B., and B.B.
>
> "Mrs. Dybwad's testimony, as it pertained to information secured during the initial interview, showed that neither parent knew how the injuries to R.W.B. had occurred; and also showed that both parents were the only persons who had cared for R.W.B. since his birth. The very same information was elicited from M.B. and B.B. while they were testifying in their own behalf, as well as from the testimony of their own expert witness . . . We therefore fail to see how M.B. and B.B. were prejudiced by the testimony of Mrs. Dybwad about their admissions during the initial interview. Even if we were applying the stricter constitutional standard to a criminal case—which we are not—we would conclude that the error was harmless beyond a reasonable doubt." *Interest of R. W. B.*, 241 N.W.2d at 556.

We find *R. W. B.* to be dispositive of this issue. It should be noted that in *R. W. B.* we left open the question of the necessity of "advising a parent of the right to counsel where the investigation involves only the initial screening of the complaint (such as where investigators visit the parents' home based upon an anonymous complaint), or an initial determination of whether or not sufficient evidence exists to substantiate such complaint." *Interest of R. W. B., supra* at 556. In this case, the investigation by Ms. Kingsley and Ms. Hanson was before the petition was filed and in response to a child abuse and neglect report. Because the evidence received through the questioning in this case was insubstantial, we hold that if it was error, it was without prejudice. Even in a criminal case, which this is not, when it can be said beyond a reasonable doubt that the evidence erroneously received did not prejudice the party, the error is not a basis for relief. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The primary issue before this court is whether Laura is a deprived child pursuant to Section 27–20–02(5)(a). The parents contend that the evidence is insufficient to support a finding of deprivation and that the problems that do exist are due primarily to their financial situation. From our review of the files, records, and transcript of the evidence, and giving appreciable weight to the findings of the juvenile court, we find that Laura is a "deprived child" and that such deprivation is not primarily caused by the lack of financial means of the parents.

Our examination of the record discloses the following relevant facts:

1. Laura was born prematurely and remained in the hospital for two months. Because of her premature birth, Laura was in need of special attention as evidenced by V.S., Laura's mother, receiving training in the feeding and care of her daughter.

2. G.S., 37 years old, and V.S., 17 years old, have had serious marital prob-

lems. At one point, V.S. received money from the Social Service Board to allow her and Laura to go to New Mexico. V.S. also spent a number of nights away from her husband, including one night in which she left her husband, hitchhiked from Belfield to Dickinson, and slept in the corridor of a motel. Both parents testified that G.S.'s drinking has caused problems, both for their marriage and for their daughter.

3. G.S. and Laura were in a local restaurant on November 30, 1977, at approximately 2:00 a. m., at a time when Laura was not properly clothed for winter weather in that she did not have any mittens or anything covering her face. G.S. needed assistance in holding Laura, he fell while carrying her, and he also needed assistance in leaving the restaurant with Laura. Evidence also indicated that G.S. was intoxicated.

4. On December 31, 1977, at 3:00 p. m., Laura's parents left her with a desk clerk at a local motel. Neither parent knew the desk clerk and no effort was made to retrieve the child until 3:00 the following morning, when G.S. called the police station looking for her. This incident occurred after Laura had been hospitalized for nine days (December 15–24, 1977) pursuant to an order for temporary custody issued by the juvenile court and in violation of certain conditions that were imposed on the parents by the Social Service Board when the parents received custody of Laura on December 24, 1977.

5. When Laura entered the hospital on December 16, 1977, she was found to be undernourished and below normal weight. During the period she was hospitalized, she began to gain weight and develop normally. Laura was also subjected to a number of developmental tests that indicated that she was functioning at a three to four-month-old level.

■ Notwithstanding that these facts are based upon evidence that the parents dispute, we believe them to be true in light of the findings of the juvenile court. We think it is significant that Laura was born prematurely and is in need of special care that the parents were not giving her. *See Bjerke v. D. T.*, 248 N.W.2d 808 (N.D.1976).

Our holding is consistent with a recent South Dakota opinion. In *People v. Interest of D. K.*, 245 N.W.2d 644 (S.D.1976), the South Dakota Supreme Court found a prematurely-born child deprived on the grounds that the child's mother neglected her child's special needs:

"Admittedly, this is a close case; there is no physical abuse of the child in the usual sense which makes for any easy decision. However, the neglect shown of this unfortunate child who requires special care and attention by a mother who is either incapable or unwilling to care for these special needs escalates this neglect to a case of abuse in this instance." 245 N.W.2d at 651.

The South Dakota Supreme Court also distinguished termination of parental rights cases:

"We think it is of particular importance to note that this is not a permanent termination of parental rights. It is a temporary placement subject to periodic review by the court. Should D.K.'s health improve to the point where he has outgrown his present problems, or the mother's life stabilize so that there would be a reasonable basis for believing she would properly care for him, the court is free to return the child to her." 245 N.W.2d at 651.

In light of our analysis of the facts, the failure of the parents to accept a continuance to meet the charges, the direction of the juvenile court that the Social Service Board place Laura with her parents when and if the parents disclose the ability to properly care for her, the order placing Laura's custody in the Social Service Board is for the limited period of two years, and thus is not a termination of parental rights and is an order subject to a continuing review, we affirm the order of the juvenile court.

SAND, PAULSON and PEDERSON, JJ., concur.

VandeWALLE, Justice, concurring specially.

I reluctantly concur with the majority opinion in this instance. I concur only because, as the opinion indicates, this procedure involves a temporary custody order subject to continuing review and not a termination of parental rights. If this were a proceeding for termination of parental rights I would dissent since I do not believe the evidence is sufficient to justify a termination of parental rights. I express that position now since the next proceeding in this matter may be a petition for termination of parental rights.

While the home life of the parents in this instance may well be far from what I would personally desire, the only evidence which I believe justifies the custody order in this instance is that Laura was born prematurely and was in need of special attention; that when Laura entered the hospital on December 16, 1977, she was found to be undernourished and below normal weight; and that during the period she was hospitalized she began to gain weight and develop normally. Although we are required to assume that her undernourished condition was due to lack of proper care by her parents, there is no direct evidence to support such an assumption. It may be that only under hospital conditions would Laura have developed normally. In any event, the fact that Laura was born prematurely and required special care is not a continuing problem. I assume that at some point in their lives premature children reach a point where they no longer require special care because of the fact that they were prematurely born. Thus I do not believe this evidence, which is the only evidence justifying the temporary custody order, can continue to be used indefinitely as a basis for removing Laura from the control and custody of her parents.