277 N.W.2d 281 (1979)
In the Interest of M. M. C., a child.
John S. FOSTER, Assistant State's Attorney, Petitioner and Appellee,
v.
B. J. C., Respondent and Appellant.
Civ. No. 9536.
Supreme Court of North Dakota.
March 15, 1979.
*282 Robert A. Alphson, Grand Forks, for respondent and appellant; argued by Donald W. Legreid.
Damon E. Anderson, Asst. State's Atty., Grand Forks, for petitioner and appellee.
Harold W. E. Anderson, Guardian ad litem, Grand Forks.
*283 SAND, Justice.
The mother of M.M.C. (hereafter Marcia, a pseudonym) appealed from an order of the Grand Forks County Juvenile Court declaring Marcia to be a deprived child and placing her in the care, custody, and control of the Director of the Grand Forks Social Service Center for a period not to exceed two years. We reverse.
A petition was filed on 19 August 1977 by the Grand Forks County Assistant State's Attorney alleging Marcia to be a deprived child. A temporary custody order was entered and Marcia was removed from the custody of her mother (B.J.C.) and placed in a foster home. On 21 October 1977 a hearing was held before a juvenile court referee who found Marcia to be a deprived child and recommended custody be given to the Director of the Grand Forks County Social Service Center for placement in a foster home for a period not to exceed two years. B.J.C. and Marcia's natural father petitioned the juvenile court for review of the referee's findings and recommendations in accordance with § 27-20-07, North Dakota Century Code. Following a hearing in April 1978, an order was filed on 2 May 1978 by the juvenile court affirming the findings and recommendations of the juvenile court referee. B.J.C. appealed the juvenile court's order to this court challenging, along with other matters,[1] the sufficiency of the evidence supporting the order.
Marcia was born out of wedlock on 9 June 1974. Marcia's mother was 48 years old at the time of this appeal, and had a history of mental health problems diagnosed as chronic undifferentiated schizophrenia for which she has been hospitalized on a number of occasions, the last period lasting approximately five or six weeks when Marcia was about seven months old.
Since the time of Marcia's birth, until her removal as a result of the temporary custody order of the juvenile court, she has been in the custody of B.J.C.
Except for a period of about one year when they resided in low-income housing, Marcia and B.J.C. lived in the home of B.J.C.'s mother, M.O. While B.J.C. was living in low-income housing she was periodically visited by an employee of Homemaker Services from Grand Forks County who assisted her in housework and the care of Marcia. There was no evidence of physical neglect of Marcia during this time, and she appeared clean and well cared for, nevertheless B.J.C. complained that Marcia got in her way because it was difficult to find a babysitter so B.J.C. could go out.
In May 1976, after Marcia and B.J.C. moved back to the home of M.O., caseworkers from the Grand Forks County Social Service visited and provided assistance to B.J.C. The caseworkers observed no signs of physical neglect of Marcia, however B.J.C. constantly complained she was tired of caring for her daughter. It also appeared to the caseworkers there was a lack of spontaneous affection between the two. The caseworkers suggested day care facilities or foster homes to lighten or relieve the burden of caring for Marcia, but M.O.'s opposition to outside care for Marcia made the suggestions unacceptable. Also, during this time there was considerable argument between B.J.C. and M.O. concerning, among other matters, the care of Marcia, B.J.C.'s smoking habits, and B.J.C.'s failure to take medication or see a psychiatrist.
In June 1977, B.J.C. was referred to Dr. Edwin G. Olmstead. After treating B.J.C. for approximately seven weeks with very little response, Dr. Olmstead suggested to B.J.C.'s caseworker that Marcia be placed in a foster home to relieve B.J.C. of the responsibility of caring for her daughter. Dr. Olmstead recommended removal of Marcia because, in his opinion, the effective treatment of B.J.C. required that she socialize, but that B.J.C. found socialization difficult or impossible while caring for Marcia. On the basis of Dr. Olmstead's recommendation, the deprivation petition was filed by the Assistant State's Attorney and Marcia *284 was removed from the custody of her mother.
At the hearing before the juvenile court referee, Dr. Olmstead testified there was little or no chance B.J.C. would recover, other than a marginal adjustment, from her emotional illness. He said that because of her illness she was not capable, nor likely of becoming capable, of expressing love and affection for her daughter.
After removal of her daughter, and subsequent to the hearing before the juvenile court referee, B.J.C.'s emotional condition gradually improved to the point she was able to hold down a part-time job until transportation problems prevented her continued employment. Also during this time it was stated that B.J.C. quit smoking and relations with her mother improved.
At the hearing before the juvenile court, caseworkers from the Grand Forks County Social Service Center testified that in their opinion B.J.C.'s improved emotional condition was the result of Marcia's removal, implying if the responsibility of caring for Marcia was again given to B.J.C. conditions would return to the point they were when Marcia was removed. Testimony was presented that during Marcia's placement in foster care there was an apparent lack of affection between mother and daughter during visitations at the Grand Forks County Social Service Center. There was also testimony that Marcia was much more active and outgoing since her placement in the foster home and problems of slowed speech and bed wetting had improved or had been eliminated.
Dr. Olmstead testified at the juvenile court hearing that B.J.C. had improved remarkably and beyond his expectations expressed at the earlier hearing before the juvenile court referee. Although her adjustment was marginal in the sense she would have to remain on medication, B.J.C. had no symptoms of her illness at the time of the hearing. Dr. Olmstead attributed B.J.C.'s improvement to the medication he prescribed, although her initial improvement could have resulted from the removal of Marcia. Olmstead testified that with the assistance of medication many persons suffering from the same illness as B.J.C. are able to adjust and lead fairly normal lives. He stated that with help, B.J.C. was perfectly capable of giving her daughter the love and care she needed. Help, in the form of someone able to assist in the care of both B.J.C. and Marcia, would be needed in caring for Marcia as the attention span of B.J.C. was short and socialization was an important part of her treatment.
A deprived child is defined in § 27-20-02(5)(a), NDCC, as one who:
"Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of his parents, guardian, or other custodian."
Parents have a constitutional right to the custody and companionship of their children. In Re J. Z., 190 N.W.2d 27, 29 (N.D.1971). Although the right of a parent to the custody of his child is not absolute and parents are not entitled to their children under all circumstances, Interest of R. D. S., 259 N.W.2d 636, 638 (N.D.1977); Bjerke v. D. T., 248 N.W.2d 808, 813 (N.D.1976), a parent's right is paramount and superior to that of any other person and the burden of disproving the presumption that a parent is a fit and suitable person to be entrusted with the care of his child rests upon the person challenging it. In Re J. V., 185 N.W.2d 487, 492 (N.D. 1971). Deprivation must be shown by clear and convincing evidence and any doubt should be resolved in favor of the natural parent. Bjerke v. D. T., supra at 811; Waagen v. R. J. B., 248 N.W.2d 815, 818 (N.D.1976). A child should be separated from his parents only when necessary for his welfare or in the interests of public safety. Waagen v. R. J. B., supra at 818.
Our scope of review in deprivation cases is governed by § 27-20-56(1), NDCC, which provides that review be based upon the files, records, and minutes or transcript *285 of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court. We are not governed by the "clearly erroneous" rule of Rule 52(a), North Dakota Rules of Civil Procedure, but are allowed to re-examine the evidence in a manner similar to the former trial de novo. Jacobson v. V. S., 271 N.W.2d 562 (N.D. 1978).
Although Marcia may have been a child lacking the necessary care for her emotional health, and thus a deprived child, at the time of the hearing before the juvenile court referee, but in this case the juvenile court was required to make its determination on the basis of the evidence presented to the juvenile court.[2] In undertaking our broad scope of review, we examine the evidence as presented to the juvenile court to determine if Marcia was a deprived child by a clear and convincing weight of the evidence. NDCC § 27-20-56(1).
The evidence was undisputed that the condition of B.J.C. improved considerably after the removal of Marcia. Prior to that time B.J.C. had difficulty in expressing affection for Marcia and the burden of caring for her daughter prevented effective treatment of B.J.C. It is not clear, however, if B.J.C.'s improved condition was the result of different medication prescribed for her, or the removal of Marcia. Quite likely it may be attributable to both. The issue as to the cause of B.J.C.'s improvement, however, is significant only for the purpose of determining if B.J.C. is now capable of providing for the necessary care and control of her daughter.
Allegations in this case are based primarily, if not exclusively, upon emotional deprivation. No one contended Marcia has ever been physically abused or neglected. Rather, it is said that B.J.C.'s inability to express affection for her child was detrimental to the emotional health of Marcia and that the burden of caring for Marcia would be detrimental to the physical and mental health of both B.J.C. and Marcia.
The testimony of Dr. Olmstead, the same person who initially recommended the removal of Marcia, indicated that in her present condition B.J.C. was capable of expressing love and affection for her daughter. He also indicated B.J.C. was capable of caring for her daughter although she would need assistance in providing that care in the form of someone to share household duties and allow B.J.C. free time for the socialization necessary for the continuation of her improved condition.
The testimony of both B.J.C. and M.O., her mother, indicated M.O. was both capable and willing to provide the necessary assistance in caring for Marcia. Both testified they got along quite well since B.J.C. began seeing Dr. Olmstead and her condition started improving.
Testimony of Grand Forks County Social Service caseworkers indicated that because of her age M.O. is not capable of providing the assistance B.J.C. needs. Yet it is clear that M.O. is presently quite able-bodied and prior to the removal of Marcia, M.O. assisted in providing for the physical needs of Marcia which have never been challenged as wanting. In addition, there was evidence presented at the hearing, through M.O., that relatives in Grand Forks were willing to give assistance to B.J.C. On appeal, the representation was made by B.J. C.'s counsel that should M.O. prove incapable or become incapable of providing B.J.C. with assistance in caring for Marcia, other *286 relatives on the West Coast have indicated their willingness to help.[3]
B.J.C. has presented evidence she is capable of providing love and affection for her daughter and also that she has the necessary help to provide for the physical needs of Marcia. Despite giving appreciable weight to the findings of the juvenile court, we cannot say the evidence is clear and convincing that B.J.C. is presently unable to supply physical and emotional care for Marcia. See, Interest of R. W. B., 241 N.W.2d 546, 552 (N.D.1976).
In reaching our determination, we are not unsympathetic to the roles and duties of our social work agencies and their dedicated employees in attempting to provide for the best possible interests of the child. Determining what is in the best interest of the child, however, is not the primary question before the court in these cases but rather if the child is deprived as defined under the terms of the statute. Interest of R. D. S., 259 N.W.2d 636, 638 (N.D.1977). It is only after the court has found a child to be deprived that the question of what disposition will best serve the interest of the child arises. In Interest of T. M. M., 267 N.W.2d 807, 812 (N.D.1978).
This court has stated its reluctance "to remove a child from its parents unless diligent effort has been made to avoid such separation" and unless it is necessary to prevent serious detriment to the welfare of the child" Jacobson v. V. S., supra at 566, quoting Bjerke v. D. T., supra, at 814. It is not reason enough to deprive parents of custody that their home is not the best, or even that they are not the best parents that could be offered to the child, so long as the child does not suffer physical or moral harm, or lack of food or clothing. Bjerke v. D. T., supra at 813. Thus, "[e]vidence that compares child-rearing skills of the natural parents and the foster parents will not alone support a finding of deprivation if the parents' efforts meet the minimum standards of care." Jacobson v. V. S., supra at 566; Interest of R. D. S., supra at 638. As we stated in Bjerke v. D. T., supra at 814:
"We are sensitive to the argument that it is dangerous to allow the judgment of social workers to determine how a family is run. Parental autonomy should be favored and State intervention minimized. This is especially true in situations where emotional or psychological harm is alleged, because of our relatively limited knowledge of child development and the nature and cause of psychological harm." [Footnote omitted.]
We recognize the possibility exists that B.J.C. may not receive the necessary assistance she needs in caring for Marcia from M.O. or others, or that B.J.C. may simply be incapable of handling the pressures of child rearing despite the use of medication. We also realize that should the above occur, it may be necessary to again initiate a deprivation action resulting in an unstable situation for Marcia, quite possibly to the emotional detriment of the child. But, as here, where the reasonable likelihood exists that B.J.C. may be capable of providing for the necessary care and support of her daughter, we cannot allow Marcia's continued removal from the custody of her mother.
The success of B.J.C.'s attempt to provide for the care and support of her daughter is heavily dependent upon the assistance she receives from others. We encourage the Grand Forks Social Service Center to explore the assistance offered to B.J.C. by relatives and continue in its efforts to seek out and to provide the necessary types of assistance B.J.C. will need.
The order of the juvenile court is reversed.
ERICKSTAD, C. J., and PAULSON, PEDERSON and VANDE WALLE, JJ., concur.
NOTES
[1] Because we conclude the evidence before us is not sufficient to support the juvenile court's order, we do not reach the other issues raised by the appellant.
[2] Ordinarily the juvenile court reviews the record made before the juvenile court referee to determine if the findings of the juvenile court referee are clearly erroneous. Rule 53(e)(2), N.D.R.Civ.P.; § 27-20-07(5), NDCC. In this case, however, it appears from the record that no transcript of the proceedings before the juvenile court referee was submitted to the juvenile court. In addition, oral evidence was presented and received before the juvenile court, apparently with the implied or express consent of the parties. Consequently, the juvenile court was required to determine the status of the child upon the evidence presented to the juvenile court and not on the basis of evidence presented to the referee.
[3] Counsel's representation does not play a role in our decision but is mentioned only for the social workers' benefit.