The PEOPLE of the State of South Dakota in the Interest of D. K., a child, and concerning W. L. and B. K.

Nos. 11712, 11792.

Supreme Court of South Dakota.

Argued May 26, 1976.

Decided Sept. 22, 1976.

J. Preston Ruddell, Jr., Rapid City, Michael A. Wolff, St. Louis, Mo., for appellant B.K., Mother of D.K.

W. H. Engberg, Asst. Atty. Gen., Pierre, for respondent State of South Dakota; William J. Janklow, Atty. Gen., Pierre, on brief.

DUNN, Chief Justice (on reassignment).

These appeals arise from an order adjudicating D.K. to be a neglected and dependent child as defined by SDCL 26–8–6 and from a dispositional order which temporarily deprived the mother of the custody of her child based upon that adjudication. Finding the trial court's conclusion supported by a preponderance of the evidence, we affirm.

The difficulties experienced by this infant in his relatively short lifetime can be recounted only with sympathy. D.K. was born August 17, 1974, five weeks prematurely. He was released to his mother two weeks later. His 24–year-old mother receives approximately $200 a month in ADC (Aid to Dependent Children) benefits as her sole support; she also receives food stamps. In addition to D.K., she has a daughter who is approximately eighteen months older than D.K. D.K.'s father does not live with them and provides no support or assistance. As a result, the mother must raise these two small children herself.

On September 24, 1974, D.K. was admitted to the hospital. His mother complained that he was suffering from a cold and that he had been vomiting. The doctor discovered on September 28th that the child had lobar emphysema, a congenital lung disease. D.K. was flown to Denver where he underwent surgery to remove part of the left lung (left upper lobectomy). Late in October, the child was again at home with his mother.

On November 5, 1974, D.K. was brought to the hospital, this time by a public health nurse. He remained in the hospital with an upper respiratory infection until the 14th of November when he was taken into custody by the Division of Social Welfare. A state social worker had filed a report in district county court seeking a preliminary investigation to determine whether D.K. was a dependent or neglected child. The court entered an order placing D.K. in the custody of the Division of Social Welfare on November 14, 1974, but dismissed that order for want of jurisdiction after a hearing on December 4, 1974. D.K. was returned to the custody of his mother on December 5, 1974.

On December 9, 1974, a petition of dependency was filed in district county court by the Pennington County State's Attorney. A hearing was set for December 20, 1974, but was never conducted. The state filed and was granted a motion to dismiss on January 20, 1975.

In the meantime, D.K. was again placed in the hospital, this time with a cold. D.K. was brought in by his mother on December 13, 1974, and remained in the hospital until December 26th with bronchiolitis. To add to this child's problems, it was discovered that he was allergic to certain foods, among them cow's milk. During this stay, the doctor prescribed a special diet of soybean milk formula.

On January 24, 1975, D.K.'s mother brought him to the hospital with a severe case of diaper rash. Shortly after admission, he developed bronchitis. He was released to his mother on January 30th.

On February 14, 1975, D.K. was hospitalized for bronchitis and bronchiolitis after his mother became concerned by his coughing and wheezing. He was discharged on March 10th, but on March 12th he was readmitted because his mother complained that he could not keep his food down. The diagnosis was mild gastritis, although that was not confirmed during the hospitalization. On March 17, 1975, D.K. was released to the custody of the Pennington County Sheriff and a notification of temporary custody was served on the mother at that time. A hearing on the matter of temporary custody was held on March 19, 1975; on March 31st an order was entered *nunc pro tunc* March 19th, giving temporary custody of D.K. to the Division of Social Welfare.

A petition of dependency was filed on March 25, 1975, and the matter was heard on April 3 and 5, 1975, in the Juvenile Division of the Seventh Judicial Circuit. On June 11, 1975, an adjudicatory order was entered finding D.K. to be a dependent and neglected child as provided in SDCL 26–8–6. A dispositional order was entered *nunc pro tunc* September 23, 1975, placing D.K. in the temporary custody of the state.

It is from these orders that the mother appeals. The first assignment of error is that there is insufficient evidence to justify a finding that the child was neglected or dependent under SDCL 26–8–6. Before we deal with that assignment, however, it is necessary to decide exactly what evidence was properly before the trial court when it reached its decision.

■ Appellant objected to the introduction of any evidence concerning events occurring prior to December 4, 1974. Essentially, it is appellant's position that the issue of "neglected or dependent child" was litigated on December 4, 1974, and that under the doctrine of collateral estoppel the state cannot relitigate that same issue.

> "The rule of collateral estoppel is 'simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" *United States v. Kills Plenty,* 1972, 8 Cir., 466 F.2d 240, 243, quoting *Ashe v. Swenson,* 1970, 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469.

After careful examination of the order involved, it is evident that the issue of "neglected or dependent child" was not litigated on December 4th. The order resulted from a hearing on appellant's motion to dismiss those portions of the November 14, 1974 order which deprived the mother of the custody of her child. The court in its December 4th order agreed that it was without jurisdiction under the authority cited (SDCL 26–8–1.1) to deprive the mother of custody and ordered the child returned to its mother.

A finding of "neglected or dependent child" can come only as the result of an adjudicatory hearing based on a petition of dependency. SDCL 26–8–1(1); SDCL 26–8–22; SDCL 26–8–22.5. No such petition was before the court; it was without authority to decide the issue at that time. The question considered was the jurisdiction to deprive the mother of custody and the court concluded it had none based upon the statute cited as authority in the order. We therefore uphold the ruling of the trial court that evidence of events prior to December 4, 1974, was admissible.

■ Appellant also contends that the testimony of the doctor and nurses, as well as the admission of hospital records as exhibits, was not admissible because of the physician-patient privilege. The privilege is a creature of statute. SDCL 19–2–3 provides:

> "A physician or surgeon, or other regular practitioner of the healing art, cannot, without the consent of his patient, be examined in a civil action as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient; provided, however, that, in any civil action or proceeding or quasi-judicial administrative proceeding, whenever the physical or mental health of any person is in issue, such privilege hereunder shall conclusively be deemed to be waived for the purpose of discovery under chapter 15–6. However, unless otherwise agreed between the parties no such discovery shall be conducted prior to ninety days before the commencement of a term of court at which the case may be on the calendar for trial."

Appellant contends that it was error to allow this evidence in the record because there was no waiver of the privilege by the mother. In the alternative, appellant contends that should the mother be unable to claim the privilege there is still an absence of waiver by the child or anyone on his behalf. The trial court found that there could be no claim of privilege in this case

because of SDCL 26–10–10 [1] and 26–10–15.[2] While we agree that the evidence was admissible, we do not agree that admissibility is predicated on those statutes.

To fall within the ambit of SDCL 26–10–10 as then in effect, it was necessary that the child suffer from starvation or serious physical injury because of abuse or wilful neglect. The evidence does not support the trial court's conclusion that the privilege was waived under this statute. Appellant argues that absent waiver under this statute there has been no waiver by anyone allowed to do so that justifies admitting the testimony. We disagree.

"The physician-patient privilege expresses a long-standing policy to encourage uninhibited communication between a physician and his patient." *Schaffer v. Spicer,* 1974, S.D., 215 N.W.2d 134, 138. It is a privilege that seeks to insure the free flow of health care, absent any fears on the patient's part that anything he says might later be used against him. It is a privilege that is personal to the patient. In the case of an infant incapable of intelligent waiver, it is a privilege that must be claimed for him. *Cory v. Bolton,* 1900, 31 Misc. 138, 63

N.Y.S. 915. It seems only logical that the parents are the proper parties to assert the privilege for the infant under normal circumstances, but when it is the conduct of those same parents that is in issue, it would be an anomalous result to allow them to exercise the privilege. It would be contrary to the interest of the child and the state to allow them to do so. *State v. Goff,* 1972, 86 S.D. 354, 195 N.W.2d 521.

Although it was within the power of the court to appoint counsel to represent the interests of the child in this case, SDCL 26–8–22.2, it is our opinion that it is also within the inherent power of the court itself to protect the interests of the child in this type of proceeding. In actions under SDCL 26–8, the welfare of the child is of paramount consideration. It should be the court's duty at every turn to see that the child is protected. Under SDCL 19–2–9,[3] the court has the duty to protect the privilege of anyone not represented in an action. Under SDCL 26–7–11,[4] the child in an action under SDCL 26–8 must be protected as a ward of the state. Under a combination of these protective statutes and the court's inherent duty to protect infants within its

---

1. At the time in question SDCL 26–10–10 provided:

    "Any physician, surgeon, dentist, doctor of osteopathy, chiropractor, optometrist, podiatrist, psychologist, social worker, hospital intern or resident, law enforcement officer, teacher, school counselor, school official, nurse, or coroner, having reasonable cause to suspect that any child under the age of eighteen years, examined by such person either for care or treatment or noticed in their usual and ordinary contact with the child has been starved, or has had serious physical injury or injuries inflicted upon him by abuse or willful neglect other than by accidental means, by any person including parent or other person responsible for his care, shall report or cause reports to be made in accordance with the provisions of §§ 26–10–11 and 26–10–12. Any person who knows, suspects, or has reason to believe that a child has received physical or emotional injury or injuries as the result of abuse or willful neglect may make a report as provided by law."

    This section was amended by the 1976 legislature to extend coverage to cases of neglect as defined by chapter 26–8 and also to cover all

physical injury, not just those classified as serious. See Ch. 167, S.L. 1976.

2. SDCL 26–10–15 provides: "The confidential relation privilege set forth in §§ 19–2–1 and 19–2–3 may not be claimed in any judicial proceeding resulting from the giving of a report concerning a child's injury or the cause thereof, pursuant to §§ 26–10–10 to 26–10–12, inclusive."

3. SDCL 19–2–9 provides: "In all cases where it shall appear to the court that any person who is not present nor represented at the hearing should be protected in his right to have any communication made under the confidential relations provisions of §§ 19–2–1 to 19–2–5, inclusive, excluded, it shall be the duty of the court to make such objections and orders for such purpose as to the court may seem necessary."

4. SDCL 26–7–11 provides: "Every proceeding under chapter 26–8 shall be in the interest of the child and the state, but with due regard to the rightful parents and others directly interested; and in any proceeding the child shall be dealt with, protected, and cared for as a ward of the state."

jurisdiction, see *Corey v. Bolton,* supra, it is within the power of the court to waive the privilege on behalf of the infant when it is not to the prejudice of the infant to do so. Here it is parental treatment of the infant that is the critical question. It is clearly within the child's best interests to have this medical testimony admitted for the consideration of the court. "Public policy forbids that the patient's protective shield ever be unnecessarily used as a sword by his physician or by any other litigant." *Snyker v. Snyker,* 1955, 245 Minn. 405, 72 N.W.2d 357, 359.

■ D.K. was found to be a neglected or dependent child as defined by SDCL 26–8–6:

"In this chapter unless the context otherwise plainly requires 'neglected or dependent child' means a child: whose parent, guardian, or custodian has abandoned him or has subjected him to mistreatment or abuse; who lacks proper parental care through the actions or omissions of the parent, guardian, or custodian; whose environment is injurious to his welfare; whose parent, guardian, or custodian fails or refuses to provide proper or necessary subsistence, education, medical care or any other care necessary for his health, guidance, or well-being; or who is homeless, without proper care, or not domiciled with his parent, guardian, or custodian through no fault of his parent, guardian or custodian. Provided however, notwithstanding any other provision of this chapter, no child who in good faith is under treatment solely by spiritual means through prayer in accordance with the tenets and practices of a recognized church or religious denomination by a duly accredited practitioner thereof shall, for that reason alone, be considered to have been neglected within the purview of this chapter."

A finding that a child is neglected or dependent comes after an adjudicatory hearing to determine if the allegations in the petition are supported by a preponderance of the evidence. SDCL 26–8–1(1); SDCL 26–8–22.10; *In re P.L.H.,* 1972, 86 S.D. 564,

199 N.W.2d 587. Our duty on review is to uphold the trial court's decision unless the findings of fact are "clearly erroneous." *In the Matter of the Neglect and Dependency of D.T.,* 1975, S.D., 237 N.W.2d 166; *In re Estate of Hobelsberger,* 1970, 85 S.D. 282, 181 N.W.2d 455. One manner used to determine whether clear error has been committed is to determine if the findings are contrary to the clear preponderance of the evidence. *Jones v. South Dakota Children's Home Society, Sioux Falls,* 1976, S.D., 238 N.W.2d 677; *Ford v. Hochstetter,* 1970, 85 S.D. 4, 176 N.W.2d 501. Using that standard, we believe the findings of the trial court are supported by a preponderance of the evidence.

The frequency of hospitalization of D.K., although not determinative of parental neglect, does infer that the child was perhaps not receiving adequate care at home. The evidence shows the house was dirty, with food and clothes scattered on the floor and with a strong odor of urine in the air. The odor was emanating not from a diaper pail or pile of dirty diapers but from the bedding of the child's crib where he was lying in a wet diaper under a wet blanket. Upon one admission to the hospital, D.K. was found to be wearing soiled clothes with a bad odor. The lack of cleanliness cannot be justified on the basis of poverty or on the basis of lack of time to properly clean the home and care for the children, as appellant's sole occupation was the care of the children in this small home.

On more than one occasion there was no food for the child, once for more than twenty-four hours, despite the availability of the formula and cereal upon request from the welfare department, and even though appellant used her food stamps to feed her sister and her sister's friend who were staying with appellant while they looked for jobs. There is evidence that on more than one occasion appellant did not follow the prescribed diet. Once she fed D.K. orange juice which the doctor testified might have caused gastritis in March 1975. Upon admission to the hospital on January 24, 1975, a male companion stated that appellant had

been "giving him the kind (of liquid) from a carton." D.K.'s older sister drank from his bottle and replaced the bottle in his mouth at least twice, once while a public health nurse was present and once while appellant was alone with her children.

The doctor testified that because of D.K.'s medical problems special care was required. This special care included a limited diet and very careful attention to normal hygiene. He stated that the presence of wet clothing and blankets and failure to feed for twenty-four hours might lower the child's resistance to infection. He also stated that the older child's placing the bottle in her mouth could certainly transmit an infection.

Appellant was repeatedly advised of D.K.'s special needs, including his diet. However, appellant testified that no one ever indicated D.K. needed a special diet or special care. This testimony seems incredible because at the same time appellant testified that she had been giving D.K. the formula and cereal prescribed. On visits by personnel from the public health and welfare departments, the dominant subject of conversation was not D.K.'s care but appellant's problems with her boyfriend and D.K.'s putative father, even though he was providing no support for appellant or the child and even though appellant was not seeking any support from him.

The trial court concluded that D.K. was without the care necessary to his health and welfare, that his mother failed to provide for his special medical needs, and that his mother did not feed him the diet prescribed by his doctor. This, according to the court, constituted lack of proper parental care and a failure to provide proper or necessary subsistence, medical care or any other care necessary to the child's health and well-being.

■ We have recognized that parents have a fundamental right to their children. However, this right is not absolute and must be balanced against the state's duty to protect children within its borders. *In Re K.D.E.*, 1973, 87 S.D. 501, 210 N.W.2d 907. Our legislature has recognized this approach, balancing the parent's right with the state's duty as guardian of neglected and dependent children. SDCL 26–7–11:

"Every proceeding under chapter 26–8 shall be in the interest of the child and the state, but with due regard to the rightful parents and others directly interested; and in any proceeding the child shall be dealt with, protected, and cared for as a ward of the state."

It is for the court to determine this delicate balance, keeping the best interests of the child paramount.

"* * * [W]e are under an obligation which we have recognized over and over again, as have the courts in all of the states of this land, and that duty lies in doing the very best we can to see that the rights of young children are properly protected. Their welfare comes first." *Schaffer v. Spicer*, S.D., 215 N.W.2d 134 at 141 (dissenting opinion).

■ In balancing the interests, there must be a showing of neglect or dependence by a preponderance of the evidence. While SDCL 26–8–6 defines neglect or dependence in terms of parental conduct or home environment, we must also focus our attention on the harm to the child. Absent evidence of potential harm, the state's interest in protecting the child is outweighed by the legitimate parental interest in retaining custody of the child.

■ Appellant contends that the statute is so vague and broad "as to reach virtually any family in any community," but that poor families are most often singled out because of their frequent contact with welfare workers. While children in many families not receiving welfare assistance may be lacking proper parental care, we believe the problems D.K. experienced in his home were not a result of appellant's poverty. They were instead a result of her inability because of limited intelligence or her unwillingness to provide the proper care. Based upon the evidence discussed above and upon other evidence in the record which supports the latter conclusion, the trial court could properly disturb the paren-

tal relation where, as here, it found the "well-being of the child plainly requires it." *Engle v. Yorks*, 1895, 7 S.D. 254, 261, 64 N.W. 132, 134.

██ A reasonably intelligent person should "by common understanding and practice" realize that for a child with a special health problem such as D.K.'s "proper or necessary * * * medical care or any other care necessary for his health * * * or well-being" requires special attention to diet and personal hygiene. SDCL ·26–8–6; *In the Matter of the Neglect and Dependency of D.T.,* supra, at 169; *Cameron v. Johnson*, 1968, 390 U.S. 611, 616, 88 S.Ct. 1135, 1138, 20 L.Ed.2d 182, 187. We reiterate the holding of D.T. that the language of the statute provides adequate standards from which an average intelligent person can regulate his conduct. In this case a higher standard of care must exist to meet the minimum level of "proper or necessary subsistence * * * medical care or any other care necessary for his health * * * or well-being." [5] Providing proper medical care for a child not only involves taking him to a doctor when his condition becomes serious or critical, it also involves providing the diet and hygiene necessary for the child's well-being at home.

██ Admittedly, this is· a close case; there is no physical abuse of the child in the usual sense which makes for any easy decision. However, the neglect shown of this unfortunate child who requires special care and attention by a mother who is either incapable or unwilling to care for these special needs escalates this neglect to a case of abuse in this instance. As the doctor testified, "his health and perhaps his life are at risk if he remains at home." The trial court had an opportunity to observe the mother and was in a far better position to determine the best interests of the child. There was substantial evidence produced by the state to sustain the finding that D.K. was a dependent and neglected child.

We think it is of particular importance to note that this is not a permanent termination of parental rights. It is a temporary placement subject to periodic review by the court. Should D.K.'s health improve to the point where he has outgrown his present problems, or the mother's life stabilize so that there would be a reasonable basis for believing she would properly care for him, the court is free to return the child to her.

Affirmed.

WOLLMAN and COLER, JJ., and BRAITHWAITE, Circuit Judge, concur.

WINANS, J., dissents.

BRAITHWAITE, Circuit Judge, sitting as a member of the court.

ZASTROW, J., not having been a member of the court at the time this case was orally argued, did not participate.

WINANS, Justice (dissenting).

I respectfully dissent. The conduct of the mother does not warrant the degree of state intervention pursued in this case. While I recognize that the conditions described reflect a less than ideal environment for this child, the environment provided was not so deficient that it amounted to neglect.

It is the duty of the court to determine the delicate balance between the fundamental right of parents to their children and the legitimate state interest in protecting children within its borders. The best interests of the child must be kept paramount. *In re K.D.E.*, 1973, 87 S.D. 501, 210 N.W.2d 907. We are not to decide whether someone other than the parent is better able to care for the child, nor are we to insure that the child has a perfect home. Many homes fall short of perfection. I do not think that the legislature intended that parents be deprived of even temporary custody of their children

5. The following states have declared by statute that the failure to provide special care to a child where it is necessary for his physical or mental condition is ground for determination as a neglected or dependent child: Alaska Stat. § 47.10.010(a)(9) (1975); Iowa Code Ann. § 232.2(13)(b) (Supp.1975); Minn.Stat. § 260.-015, subd. 10(d) (Supp.1975); Okl.Stat.Ann. tit. 10, § 1101(d) (Supp.1974); and Wis.Stat.Ann. § 48.13(1)(e) (Supp.1974).

merely because they are not able to furnish an environment we would wish all children to have. The court's duty is to decide if the environment provided is so imperfect that it amounts to neglect of the child. *In re Rinker*, 1955, 180 Pa.Super. 143, 117 A.2d 780; *Blow v. Lottman*, 1953, 75 S.D. 127, 59 N.W.2d 825.

The trial court found that D.K. was without the care necessary to his health and welfare; that his mother failed to provide for his special medical needs; and that his mother did not feed him the diet prescribed by the doctor. This, according to the majority, constituted a lack of proper parental care and a failure to provide proper or necessary subsistence, medical care or any other care necessary to the child's health and well-being. Essentially this is a restatement of the broad statutory standards for neglect found in SDCL 26–8–6. Admittedly the statutory standards in this type of case must be broad, but those legislative guidelines must not be so broad that they permit ad hoc judicial determinations as to what conduct falls within the statute's purview. To justify judicial intervention into the time-honored parent-child relationship we should require that some minimum threshold level of deficient conduct be established. The conduct reflected by the record, while less than perfect in several regards, does not rise to that minimum level of deficiency.

The evidence showed that on occasion the house was dirty, D.K. was in wet diapers, and there was a smell of urine in the air. The baby was fed several times by propping the bottle. The child has a history of typical childhood diseases—diaper rash, colds, bronchitis, croup. The doctor's testimony was that the congenital lung defect might lower resistance to such viral infections. He expressed the same opinion as to wet diapers. He concluded that the child needed special attention because of this and recommended that the child be kept out of crowds, that his diet be observed, and that he be kept clean.

The record contains no evidence that the mother subjected the child to crowds. The child was placed on a special diet in December, 1974. Assuming that the mother was informed of the diet at this time, a fact that is hardly clear from the record, the evidence shows only one occasion that the child was actually ill because the diet was not followed, that being when the child was fed orange juice. This is certainly not overwhelming support for the finding that the mother failed to follow the prescribed diet.

The record showed that food was a problem for this family; that is certainly not unusual for families forced to subsist on government aid. Although I am deeply troubled by the one instance when the child was without food for 24 hours, the record demonstrates that on other occasions the mother was able to secure food for her family from other sources, including the welfare department. Indeed the doctor's records reflect at several points his observation that the child was well-nourished.

The trial court found that the mother failed to provide for the special medical needs of her child. The record shows that she brought the child to the hospital five of the six times he was there. Surely that indicates some concern for the child's health. In fact the doctor testified that he thought the mother might be oversensitive to the child's health problems.

Even assuming the standards found in SDCL 26–8–6 are not impermissibly broad, I do not feel the preponderance of the evidence supports a finding of neglect. Many of the deficiencies noted exist in many homes across the state. We should exercise great caution before we impose the practical standards of the wealthy and educated on the poor and less educated segments of our society.

The trial court did not consider less intrusive measures as a possible solution. Nor is there any indication that the court considered possible harm to the child brought about by separation from his mother. I would find that these are factors that must be considered before the state can justify interference with family life.

Examination of cases in this area of the law shows that while the conditions relied

on by the trial court in this case have been considered by other courts, none has relied solely on similar facts to justify a finding of neglect. Typically factors like a dirty house and wet diapers are accompanied by other circumstances which cause the court to consider whether the situation is one that warrants judicial interference. See *In re K.D.E., supra* (physical abuse and isolation from other family members); *Matter of D.T.,* 1975, S.D., 237 N.W.2d 166 (hunger, beating, and dirty clothing among other things); *In re P.L.H.,* 1972, 86 S.D. 564, 199 N.W.2d 587 (abandonment and alcoholism); *In re Raya,* 1967, 255 Cal.App.2d 260, 63 Cal.Rptr. 252 (parental immorality); *In Interest of Kinkner,* 1974, 191 Neb. 367, 216 N.W.2d 165 (dirty home, smell of urine, dirty dishes, immoral climate, and danger of physical abuse by nonparent); *In re Rinker, supra* (immorality, condition of home, leaving children alone, and alcoholic excesses). These cases demonstrate that a minimum threshold of deficient conduct must be crossed before intervention by the long arm of the state is justified. I do not believe there is justification for the degree of interference present in this case and would therefore reverse.