286 N.W.2d 324 (1979)
In the Matter of J. M. A., Alleged Dependent Child.
No. 12739.
Supreme Court of South Dakota.
Argued November 9, 1979.
Decided December 19, 1979.
Rehearing Denied January 28, 1980.
Janice Godtland, Asst. Atty. Gen., Pierre, for respondent, State of South Dakota; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.
Richard L. Johnson, Sioux Falls, for appellants, Mr. and Mrs. A.
Mary Sue Donohue, Sioux Falls, for J. M. A.
MORGAN, Justice.
This is an appeal from the decision of the Circuit Court, Second Judicial Circuit, terminating appellants' parental rights to their two and one-half year old son. Appellants will be referred to as Mr. and Mrs. A., and their son will be referred to as J.A. We affirm the trial court.
J.A. was born in July of 1977 in Yankton, South Dakota. In August of that year, Mrs. A. was admitted to the Human Services Center for treatment which lasted until October 13, 1977. While Mrs. A. was hospitalized, Mr. A. assumed the care of J.A. Prior to J.A.'s birth, Mr. and Mrs. A. had received help from the Department of Social Services (Department) in the form of homemaker services and marital counseling. During Mrs. A.'s hospitalization, the Department continued to help Mr. A. by providing day care for the baby as well as homemaker services.
Sometime in August, Mr. A. moved to Sioux Falls where he stayed with relatives *325 who assisted him in caring for J.A. When Mrs. A. was released from the Human Services Center, the couple moved to an apartment in Sioux Falls.
After Mrs. A.'s return, the couple's marital situation worsened, to a point where, in November of 1977, Mr. A. struck Mrs. A. and injured her. At that time, the social workers became concerned for the child's safety and persuaded Mr. and Mrs. A. to sign a "Home Contract" which essentially outlined certain measures the couple should take to protect the child from injury should violence erupt again. Included in the contract was a provision that the couple would take the child to the Children's Inn, a crisis facility, if they felt his safety was jeopardized by their fighting. Mr. and Mrs. A. used this facility several times.
The couple continued to have frequent fights and the Department was having little success in alleviating the marital problems. The couple was having financial problems since Mr. A. was unemployed and tension in the household increased. The social worker assigned to their case assisted them by continuing to arrange for day care services and homemaker services so that Mr. A. could job hunt and Mrs. A. could receive guidance in household management and child care techniques. Violence in the home intensified, however, and on December 6, 1977, the State filed a petition and affidavit alleging J.A. to be a dependent child. That same day, J.A. was removed from the home and placed in a foster home.
On January 6, 1978, in lieu of the adjudicatory hearing scheduled for that day, Mr. and Mrs. A., upon the advice of counsel, entered into a stipulation with the State which stated that the court would be justified in finding J.A. to be a dependent child and in terminating their parental rights. The stipulation went on to state that the State wished to give the parents a chance to prepare themselves for the parenting role and, therefore, a dispositional hearing would be adjourned for six months to provide the couple time to improve their situation. Certain conditions were placed on the couple including requirements that the couple get counseling from the Department; that Mr. A. get a job; and that the couple refrain from using violence to resolve their differences. Pursuant to this stipulation, J.A. was returned to the couple.
The home situation improved then for some time. Mr. A. found a job and the couple refrained from acts of violence. The harmony did not last, however, and in March and April of 1978, violence erupted again with Mrs. A. often being bruised and beaten.
Consequently, on May 5, 1978, an Order to Show Cause Why Parental Rights Should Not Be Terminated was issued and J.A. was again removed and placed with a foster family. A dispositional hearing was begun on July 6, 1978, but was adjourned after two days of testimony so that Dr. Thomas Aceto, a pediatric endocrinologist, could examine J.A. and prepare a report for the court. The hearing concluded on November 27, 1978, with the court terminating the parental rights of both Mr. and Mrs. A.
At the dispositional hearing, Dr. David Munson, a pediatric physician who treated J.A. from the time of the child's birth, testified on behalf of the State. According to Dr. Munson, J.A. suffered from developmental retardation, primarily in the areas of gross and fine motor skills. The doctor's opinion was based on results of the Denver Developmental Test, regularly performed on J.A. These tests are used by pediatricians to measure growth rate. Dr. Munson attributed the developmental delay to J.A.'s environment which he felt left J.A. emotionally deprived. Dr. Munson suggested that the problem was severe enough to create the possibility that J.A. might become autistic. Dr. Aceto and two of his colleagues, who had examined J.A. twice, concluded that J.A.'s problem is neurological but conceded that the child showed signs symptomatic of autism; that he will need an ideal home environment in order to improve developmentally; and that he would have a better prognosis if he had caretakers other than his natural parents.
The evidence adduced at the dispositional hearings shows that Mr. A. is a man with a *326 violent temper who has been committed to Yankton several times. He was characterized by one social worker as suffering from an "explosive personality disorder." However, as the State concedes, Mr. A. has never physically abused J.A. or any of his children from former marriages. Instead, his violence is vented against other adults and primarily his wife. On one occasion, Mr. A. struck and injured a female social worker and was found guilty of simple assault. The State further concedes that Mr. and Mrs. A. have a genuine concern and affection for J.A. but argues that neither parent is capable of providing the type of environment conducive to improving J.A.'s developmental deficiencies.
Considerable testimony was presented by various social workers who had worked with Mr. and Mrs. A. The general consensus was that the couple was not benefitting from the services the Department was providing to help them improve their marital situation and parenting skills. The evidence showed that the couple continually received a variety of services from the Department from a time prior to J.A.'s birth throughout the dispositional proceedings. These services included parenting instruction, visiting nurses, homemaker and day care services, and marriage counseling. The testimony indicates that the various social workers felt that Mr. and Mrs. A. were not taking full advantage of all the assistance offered them by the Department because they were too preoccupied with their own personal and emotional problems which interfered with their ability to relate to J.A. Thus, although J.A. was never physically injured by either parent and was always kept reasonably well-clothed and fed, neither parent was able to form a true bond with the child who, according to Doctors Aceto and Munson, is withdrawn and manifests a severe inability to relate to people.
The trial court found that Mr. A. failed to demonstrate his ability to provide adequate care without violence and was unwilling or unable to improve his parenting skills largely due to his long-term personality disorder and his resentment at attempts at counseling. The court further found that Mrs. A. is unable to provide proper parental care because, even with counseling, she had demonstrated no improvement in that area and had left J.A. unattended several times. The trial court also found that Mrs. A. was incapable of divorcing her extreme marital problems from her responsibilities for J.A. Additionally, the trial court found that J.A. suffers from extensive physical and psychological problems which require a serene and calm environment which neither Mr. or Mrs. A. is able to provide.
Appellants argue that the trial court's findings are not supported by a preponderance of the evidence and that the court erred in terminating their parental rights because termination will not serve the child's best interests. The question presented for this court's determination "`is not whether it would have made the same findings the trial court did, but whether on the entire evidence it is left with a definite and firm conviction that a mistake has been committed.'" People in Interest of T.C., 278 N.W.2d 452, 454 (S.D.1979). See also, Cunningham v. Yankton Clinic, P.A., 262 N.W.2d 508 (S.D.1978); In re Estate of Hobelsberger, 85 S.D. 282, 181 N.W.2d 455 (1970).
With the advice of counsel, Mr. and Mrs. A. stipulated in January of 1978 that an adjudicatory hearing was unnecessary, that J.A. was a dependent child and that the court would be warranted in terminating their parental rights. From our review of the record, it appears there were sufficient facts to support those conclusions. However, the stipulation allowed Mr. and Mrs. A. a chance to avoid termination if they would abide by certain conditions designed to improve their parenting skills and their marriage so that violence could be avoided. The record is replete with evidence that the parents are incapable of resolving their problems without resorting to violence and that little, if any, progress was made in getting the couple to analyze their behavior and attempt to remedy it. Furthermore, even though the medical experts *327 could not agree on the precise etiology of J.A.'s developmental retardation, they did agree that the home environment provided by appellants, along with their unwillingness or inability to improve the situation, would not promote J.A.'s best interests in terms of his psychological and physical health.
The stipulation signed by appellants in January contained the following language:
Respondent parents specifically waive their right to separate adjudicatory and dispositional hearings herein and agree that, upon further hearing if any, it shall be sufficient for the State to show their lack of cooperation with the proposal set forth in item "6" above or such other or additional provisions as the Court may impose or their lack of progress toward achieving suitability and fitness as parents to justify termination of their parental rights in and to said child and the placement of said child for adoption or other suitable placement.
Under the terms of this stipulation, the parents explicitly agreed that the court would be justified in terminating their parental rights should they fail to comply with the conditions placed upon them. There is ample evidence in the record to support the conclusion that Mr. and Mrs. A. did not conform their behavior to the terms of the stipulation, with the most glaring violation being the continued acts of violence. Furthermore, there is no evidence that Mr. and Mrs. A. will be any more able or willing in the future to modify their behavior considering the absence of any improvement in their home life even with the extensive assistance rendered them by the Department. Consequently, since the terms of the stipulation limited the State's burden of proof to a showing that the parents failed to act in accordance with the conditions set forth in the stipulation, and the State fully met that burden, the trial court was justified in terminating appellants' parental rights.
The judgment is affirmed.
WOLLMAN, C. J., and DUNN and FOSHEIM, JJ., concur.
HENDERSON, J., concurs specially.
HENDERSON, Justice (concurring specially).
I would ground an affirmance in this case on two concepts: (1) the harm done thus far to J.A.; and (2) the potential harm to him.
Appellants place great stress on the lack of any physical abuse of J.A. This court has terminated parental rights when there was no evidence of physical abuse. Matter of V. D. D., 278 N.W.2d 194 (S.D.1979).

HARM DONE TO J.A.
J.A. was unable to relate to Mr. and Mrs. A. He manifested interest in objects, rather than his parents, and crawled to corners and rubbed his head against the wall. He was inattentive to his parents and did not progress in his development as a child. His neck was limp and wobbly. J.A. had a neurological problem, and one Dr. Aceto testified that J.A. would require extensive outside care and medical treatment. Finding IX of the trial court states that neither appellant is able or willing to provide for the child's exceptional needs. This finding is not clearly erroneous.
Mrs. A. attempted to slash her wrists while holding J.A. She used him as a shield in a fight with her husband. She frequently left him unattended and J.A. would roll off of beds and tables. When Dr. Aceto discussed J.A.'s special needs with Mrs. A., she responded "We don't need outside help." Mrs. A. was twice hospitalized for mental problems since J.A. was born. Finding VIII states that Mrs. A. is unable to provide proper parental care for J.A. Again, this finding is not clearly erroneous.
Mr. A. had been admitted to the Human Services Center at Yankton 10 times in 15 years. Mr. A. had a long history of violence and marriage instability. He had assaulted all three of his fathers-in-law. One he hit over the head with a bat and the father-in-law had to be hospitalized. He struck his own father in 1974 or 1975. He also hit a sixty-year-old policeman and one of his *328 wife's girlfriends. He assaulted a social worker involved in this case and was convicted therefor. He struck Mrs. A. while she was pregnant with J.A. Mr. A. frequently beat and battered Mrs. A. to the extent that she was bruised, had a bloody nose, and broke her glasses. In short, he was a man of great violence. Finding VII of the trial court states that Mr. A. is unwilling or unable to improve his parenting skills in that several years of counselling has not changed his explosive personality disorder, and that he has indicated he did not need help with his child's special needs. This finding of the trial court is obviously not clearly erroneous.

POTENTIAL HARM TO J.A.
The potential harm to J.A. is manifest. J.A. could, in the future, be the recipient of the same violence suffered by Mrs. A. or the other victims described above. Neither parent recognizes the need for the special medical attention that J.A. will require in the years to come. Thus, if Mr. and Mrs. A. retain custody of J.A., he will never have an opportunity to function as a normal child. Mr. and Mrs. A. expound their rights, but J.A. also has rights, and the law must not abandon him. He must be permitted to grow and flourish in the fountain of his life.

CONTRACTS UNACCEPTABLE
I do not and will not legally bless any contract entered into between Mr. and Mrs. A. and the Department of Social Services and base a decision upon an alleged violation thereof. The question before a court of law should not be whether a contract was violated, but rather whether a child has been neglected and the termination of the parental rights was proper under our state statutes and decisions of this court. Nor would I found a decision based upon a violation of a condition in a stipulation. To specifically waive a dispositional hearing and deem it to be sufficient if the parents show a lack of cooperation "with a proposal set forth in item 6," is a dangerous pact which usurps the legitimate function of a trial judge. I am fearful of a state agency's judgment replacing the judgment of a judge.
In State v. Prosser, 78 S.D. 35, 43, 98 N.W.2d 329, 334 (1959), we stated: "Moreover, the parties cannot by agreement make the recommendation of such an agency binding upon the court since the power of the court to determine matters of custody cannot be delegated to anyone." I fully appreciate that Prosser, supra, was a habeas corpus proceeding. And I fully appreciate that this case is neither habeas corpus or a child custody case. However, I do not wish to see a growing use in this state of compacts, contracts, and stipulations between parents and the Department of Social Services regarding the custody of children in dependency and neglect cases which will further erode the powers of the judiciary.

TERMINATION OF RIGHTS
SDCL 26-8-36 provides as follows: "The court may enter a decree terminating all parental rights of one or both parents in the child when it finds that the best interests and welfare of the child so require."
This court has recognized that parents have a fundamental right to their children. The right is not absolute and must be balanced against the state's duty to protect children within its borders. People in Interest of D. K., 245 N.W.2d 644 (S.D.1976); In re K. D. E., 87 S.D. 501, 210 N.W.2d 907 (1973). In People in Interest of D. K., supra, this court upheld a finding of dependency and neglect where there was no physical abuse of the child in the usual sense. In D. K., the child had special needs and the mother was incapable or unwilling to care for those special needs. In this case, J.A. has special needs and the parents do not recognize the needs, have refused proffered help, and by their own admissions will not accept assistance in the future.
The evidence adduced at trial supports the trial court's determination of terminating the parental rights of Mr. and Mrs. A. Appellants must demonstrate by clear evidence that the trial court abused its discretion in adopting its findings rather than *329 those of the appellants. Matter of S. J. Z., 252 N.W.2d 224 (S.D.1977). The parents failed to meet their burden.