342 N.W.2d 672 (1983)
The PEOPLE of the State of South Dakota, In the Interest of S.L.H., a Minor Child and Concerning F.H.O. and P.H.
No. 14095.
Supreme Court of South Dakota.
Argued September 14, 1983.
Decided December 21, 1983.
Rehearing Denied January 31, 1984.
*673 Roberta Jean Earley, Spearfish, for appellant F.H.O.
William E. Anderson, Belle Fourche, for appellee S.L.H.
Thomas E. Brady, Spearfish, for appellee P.H.
Janice Godtland, Asst. Atty. Gen., Pierre, for appellee Dept. of Social Services; Mark V. Meierhenry, Atty. Gen., Pierre, on the brief.
WOLLMAN, Justice
This is an appeal from an order of adjudication of dependency and neglect and a decree of disposition terminating appellant-mother's parental rights. The circuit court entered the order and decree subsequent to our remanding the case with instructions to conform to the "clear and convincing" evidentiary standard required by Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). See In re S.H., 323 N.W.2d 851 (S.D.1982). We affirm in part and reverse and remand in part.
S.L.H. was born September 14, 1976. F.O., his mother, and P.H., his father, were separated prior to S.L.H.'s birth and divorced in 1977. Prior to the commencement of the dependency and neglect action in 1980, P.H. had seen S.L.H. about four times and had never provided financial support for the child.
In February of 1978, Department of Social Services (Department) received information that S.L.H.'s mother had left S.L.H., then seventeen months old, alone in their apartment. The social worker who conducted the investigation found that the mother had made arrangements for a babysitter who had turned out to be unreliable and that S.L.H. was alone and within reach of an oil stove that had an open flame. Department had contact with S.L.H. and his mother later that month when the mother had been evicted from her apartment and was out of money, food stamps, and diapers for S.L.H. S.L.H. was without socks, was dirty, and had impetigo. A doctor later diagnosed S.L.H. as being developmentally delayed and also referred S.L.H. to an ophthalmologist. Department helped the mother find another apartment and the mother agreed to place S.L.H. in foster care. In approximately ten days, S.L.H. was returned to his mother after she had cleaned her apartment and their clothes and had agreed to allow Department to be protective payee for ADC credit.
*674 In March of 1978, Department received an anonymous and unverified report that S.L.H. was left alone. Upon investigating the situation, the social worker found S.L. H.'s mother in the apartment and apparently immobile because of an infected cut on her foot. The social worker also found that the mother was out of food stamps and that the apartment was dirty and disorganized. The mother informed the social worker that she was unable to put up S.L. H.'s crib and that she had been making a bed for him in the bathtub.[1]
The mother had to be hospitalized for her foot infection and again agreed to place S.L.H. in foster care. This foster care placement lasted for six to eight months. For part of this time the mother was also placed in the foster home so as to acquire some advice on parenting.[2] Subsequent to her leaving the foster home and prior to S.L.H. being returned to her, the mother had given birth to a child, which she gave up for adoption.
At the time S.L.H. was returned from foster care, the mother had remarried and was living with her husband, an employee at the Homestake Mine, and his two children. The social worker felt that the home situation was improving, and for approximately one year after S.L.H.'s return there were no problems requiring Department intervention beyond occasional home visits by the social worker.
In October of 1979, Department investigated S.L.H.'s home situation after being informed of an accident in which S.L.H.'s eleven-year-old stepsister had shot herself in the chest with a loaded gun that was kept in the parents' bedroom. The parents were not at home and the stepsister was babysitting S.L.H. and his stepbrother at the time of the shooting incident. The gun, which was loaded with buckshot, was kept in a holster about three feet from the floor, and the social worker thought it was conceivable that S.L.H. could have reached the weapon. In December of 1979, the social worker investigated the home after being informed of bruises on S.L.H.'s face. The social worker found that the mother was not home at the time S.L.H. was injured, and that S.L.H. had fallen down the basement stairs while he was being taken care of by the eleven-year-old stepsister. Prior to this fall, the stepfather had installed an additional rail for S.L.H. to use on the stairs and family members had supervised his going down the stairs. The social worker requested that the mother get a gate for the basement doorway, which she did.
In May of 1980, Department took custody of S.L.H. and placed him in a foster home. The primary reason for removing the child from the home was the mother's alleged refusal to allow a computerized axial tomography (CAT) scan examination of S.L.H.[3] Other reasons given for the removal included reports of improper supervision in the home, observations that S.L.H. was dirty and wearing inappropriate clothing, and a psychiatric social worker's report stating the relationship between S.L.H. and his mother was "more competitive than nurturing."
When questioned about the supervision in the home, the social worker who had initiated the dependency and neglect proceedings conceded that S.L.H. had not been left alone but had been left with his stepsister, who in the social worker's opinion was not incapable of babysitting. Although he was unable to cite specific examples, the social worker felt, however, that the stepsister *675 was babysitting S.L.H. too often and for too long. The social worker also conceded that with the exception of his hands and face, S.L.H. was not unclean and that it was possible that S.L.H. had simply gotten dirty from playing. The concern regarding inappropriate clothing stemmed from observations by the social worker and S.L.H.'s teacher that S.L.H.'s clothes were too large. The teacher was also concerned that S.L.H. often did not wear socks and that a pair of cowboy boots which he sometimes wore and was apparently quite fond of were too long. Both the teacher and social worker considered S.L.H. to have been properly fed.
S.L.H.'s mother refused to consent to a CAT scan for S.L.H. when a pediatrician from Rapid City requested that this test be performed. The mother refused because she thought that the test would involve sticking pins and needles in S.L.H.'s head and running electricity through his head and that such a test would not be healthy for the child. The mother informed the social worker that she wanted a second opinion regarding the CAT scan and that she had made an appointment at the Homestake Clinic to obtain the second opinion. S.L.H. was taken from the home prior to the time set for the appointment.
S.L.H. has apparently always had several problems. He suffers from intermittent exotropia, a condition in which one eye deviates outward intermittently. He also has a stiff heel tendon. S.L.H. has consistently been diagnosed as being developmentally delayed. At the age of four his level of intellectual function was tested and found to be within the mild mental retardation range. His special education teacher reported that S.L.H. fell down frequently, had bruises, and had problems in speech and other areas.
Department presented evidence by which it attempted to link S.L.H.'s developmental retardation with his environment. On August 15, 1978, the diagnosis of the Rapid City pediatrician was "developmental retardation, etiology uncertain, but most probably secondary to maternal deprivation." The doctor testified that at that time S.L.H. had been in foster care for three to four months and had made unbelievable progress since being with his new parents. The doctor also testified that he was unaware that the mother had been in the foster home. A psychologist's report stated that "while all of [S.L.H.'s] difficulties cannot be related to environmental causes, it seems to have significantly contributed to his lack of development."
Psychological evaluations of S.L.H.'s mother were also presented in these proceedings. One psychologist described the mother as manifesting symptoms of a severe personality disorder and as exhibiting narcissistic and borderline personality traits. This same psychologist also concluded that the mother exhibits a chronic history of poor adjustment and poor judgment and that her maternal capacity appears extremely limited.
A psychiatric social worker who had examined the mother as early as 1978 and had earlier described the relationship between S.L.H. and his mother as more competitive than nurturing, examined the mother again in 1981 and concluded that her capacity for judgment had improved since 1978 and that she clearly exhibited a capacity for change. When asked for an opinion regarding the mother's maternal capacities, this psychiatric social worker responded, "Subjectively I would not want her raising my children, but most of the people I know I would not want raising my children." Another psychiatric social worker testified that his testing of the mother indicated no serious emotional or psychotic illness.
There was considerable testimony concerning the sexual conduct of S.L.H.'s mother and stepfather. They had participated in "swinging," the exchange of sexual partners, on five or six occasions in 1979 and 1980. This "swinging" did not occur in S.L.H.'s presence.
Subsequent to S.L.H.'s removal from the home, there was an incident in which the stepfather hit S.L.H.'s mother. The social worker filed an affidavit of dependency and *676 neglect concerning S.L.H.'s stepbrother and stepsister, and the stepsister has left the home. The stepsister was allegedly sexually abused by the stepfather. The stepbrother remains in the home, and the record does not reflect why the affidavit of dependency and neglect concerning him was filed.
The original decree of disposition as well as the one entered after remand terminated the mother's parental rights and granted legal custody of S.L.H. to Department. The decree further ordered that S.L.H. be placed with his father, P.H., and his wife, J.H., through the Interstate Compact for Juveniles, SDCL ch. 26-12, for supervision by the state of Minnesota, where P.H. and J.H. were then living. P.H. and J.H. have had a history of financial, marital, chemical dependency and other problems.
Since the time S.L.H. was placed in P.H. and J.H.'s home, J.H. has left P.H. because he abused her and her two oldest children. S.L.H. remained with P.H. until the Department of Social Services removed S.L.H. from the home after receiving numerous reports concerning P.H.'s failure to properly feed and bathe S.L.H. as well as reports alleging physical abuse of S.L.H. We were advised at oral argument that a hearing had been set on Department's dependency and neglect petition with respect to P.H.'s treatment of S.L.H. On November 8, 1983, we were furnished with copies of the trial court's findings of fact, conclusions of law, and decree of disposition entered on October 26, 1983. The decree of disposition terminated P.H.'s parental rights in S.H. pursuant to P.H.'s voluntary relinquishment of his parental rights and his request that the trial court enter an order terminating those rights.

ADJUDICATORY FINDINGS
Appellant contends that the adjudication of the child as dependent and neglected was not supported by clear and convincing evidence. We do not agree.
In Santosky v. Kramer, supra, the United States Supreme Court held that due process requires proof by clear and convincing evidence in a parental rights termination proceeding. See also In re S.H., supra; SDCL 26-8-22.10. In defining clear and convincing evidence, we have stated that
[i]ts technical meaning has been expressed as "the witnesses must be found to be credible, that the facts to which they have testified are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct and weighty and convincing as to enable either a judge or jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue."
In re L.A., 334 N.W.2d 62, 65 (S.D.1983) (citing Cromwell v. Hosbrook, 81 S.D. 324, 329, 134 N.W.2d 777, 780 (1965)) (citations omitted). See also In re S.H., 337 N.W.2d 179 (S.D.1983); In re J.W.W., 334 N.W.2d 513 (S.D.1983). It should be noted, of course, that the evidence need not be voluminous or undisputed to satisfy this measure of proof. Brown v. Warner, 78 S.D. 647, 107 N.W.2d 1 (1961).
A neglected or dependent child is one "[w]ho lacks proper parental care through the actions or omissions of the parent, guardian, or custodian." SDCL 26-8-6(2). The trial court found that S.L.H.'s developmental retardation resulted at least in part from environmental deprivation and that there were instances where the mother provided poor care for the child, including failure to arrange for reliable babysitters and proper supervision for the child. After reviewing the entire record, we cannot say that these findings are clearly erroneous. SDCL 15-6-52(a); In re Estate of Hobelsberger, 85 S.D. 282, 181 N.W.2d 455 (1970). Especially is this true in the light of S.L.H.'s special needs stemming from his physical and mental condition. We therefore conclude that the trial court did not err in adjudicating S.L.H. as dependent and neglected within the meaning of SDCL 26-8-6(2).

DISPOSITIONAL ORDER
The mother also contends that the trial court erred in terminating her parental rights. We agree.
*677 Natural parents have a fundamental liberty interest in the care, custody, and management of their children. Santosky, supra; see also Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). As the United States Supreme Court has explained:
The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life.
Santosky, 455 U.S. at 753, 102 S.Ct. at 1394, 71 L.Ed.2d at 606. This fundamental right, however, is neither absolute nor unconditional. In re N.J.W., 273 N.W.2d 134 (S.D.1978); In re K.D.E., 87 S.D. 501, 210 N.W.2d 907 (1973).
In determining whether to terminate parental rights, the paramount consideration is the best interest of the child. SDCL 26-8-36; In re M.S.M., 320 N.W.2d 795 (S.D.1982). It is hazardous, however, to assume that removing a child from an imperfect home invariably will benefit the child. Santosky, 455 U.S. at 765, 102 S.Ct. at 1400, 71 L.Ed.2d at 614, n. 15. Although parents and their children do not have identical interests, "the parental interest in the companionship, care and custody of the children is a strong one and is reciprocated by the child's equally weighty interest in the nurture, love and instruction of the parents." Lehman v. Lycoming County Children's Services, 648 F.2d 135, 152 (3rd Cir.1981), aff'd, ___ U.S. ___, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982). The trial court at a dispositional hearing should balance the rights of the parent with the best interests of the child and the public. In re P.M., 299 N.W.2d 803 (S.D.1980).[4]
In a dispositional hearing, the trial court must apply the least restrictive alternative. In re N.J.W., supra. See also In re S.H., supra, 337 N.W.2d 179; In re L.A., supra. If, however, efforts to assist the parent through the use of social services proves unavailing, the trial court is justified in terminating parental rights. In re S.S., 334 N.W.2d 59 (S.D.1983).
The trial court found that since 1977 the Department of Social Services has "made every effort to assist Respondent mother in learning to care for her child and that Respondent mother fails and refuses to accept guidance and supervision." We conclude that this finding is not supported by clear and convincing evidence.
The following testimony was given at the dispositional hearing:
Q. If you recall, what was the level of cooperation you received from the mother [in 1978]?
[social worker]
A. Well, at that time she was in such a destitute, desperate type of situation, both for herself and the child, that she seemed to really, you know, reach out for help.
Q. She was cooperative.
[social worker]
A. Yes.
At the adjudicatory hearing, the social worker testified as follows regarding the problems in 1978 and the resolution of those problems:
Q. Okay. And so at that time you think the problem was more one of education, would you say, and maybe background?
A. Yes, that was part of the problem.
Q. Okay. When you say "That was part of the problem," what would be the other part? The child's personality, or
A. Well, I think it's more than just the education. I think that the child was in need of protection.

*678 Q. Okay. But basically as far as those things that you talked about in those reports, as far as you know they have been remedied, is that correct?
A. The situation as it existed back then in `78 has been remedied through the foster care placement and then returning S.L.H. to the home.
Q. Okay. And whenever [the mother] has had any occasion to need help do you feel she has sought it out?
A. Yes.
When the social worker was asked whether the mother's actions with regard to the CAT scan was the first occasion she had ever resisted any suggestions or referrals made by him, the social worker responded, "That was the first obvious resistance to me, to my efforts, yeah." The social worker then conceded that between February of 1978 and May of 1980, the mother had cooperated with him.
Department frequently made doctor appointments for S.L.H. and often provided transportation for these visits since the mother at that time did not have a car or driver's license.[5] The social worker conceded that the mother made sure that the appointments were kept. He also agreed that the doctor who requested the CAT scan was the only doctor who had encountered resistance by the mother. The social worker felt, however, that the mother should have provided the transportation.
While the mother has expressed resentment regarding the type and extent of Department's intervention in her home, we will not equate this resentment with a refusal to cooperate with Department. We also note that any conflicts between the mother and social worker have not been one-sided. The social worker admitted at the dispositional hearing that he had made statements that he was perhaps too prejudiced to be involved in the case and that perhaps he could not be objective in his recommendation regarding the mother's parental rights.
The mother also initiated action for the benefit of S.L.H. She had, on her own initiative, joined a single parents group which the social worker felt was beneficial. She made appointments with doctors and contacted the county nurse several times for information regarding S.L.H. When S.L.H. was three years old, the mother on her own initiative enrolled him in a special education program because he was developmentally delayed. S.L.H. improved in this program. The special education teacher testified that the mother had initiated telephone conferences with her regarding S.L. H.'s progress and that she had no knowledge that the mother had not followed her recommendations.
The mother characterized a program S.L.H. was involved in at the Rapid City Rehabilitation Hospital as "just something else to play with besides his own toys" and did not comply with a suggestion made by the therapists in the program that she build a sandbox for S.L.H. While her perceptions and reactions to this program and the recommendation for a CAT scan may be less than intelligent and mature, we have held that "we will not countenance a termination of ... parental rights merely due to [a] lack of intelligence and understanding of some suggestions...." Matter of R.H., 300 N.W.2d 271, 274 (S.D.1981).
The trial court placed much emphasis on the child's special needs. We can appreciate this concern. See Matter of J.M.A., 286 N.W.2d 324 (S.D.1979). While the mother may very well be inept at articulating the nature of S.L.H.'s problems, we are convinced after reviewing the entire record, however, that she is neither unaware of nor unconcerned about these problems. In addition to evidence regarding the mother's cooperation and capacity to change, the psychiatric social worker who has worked with the mother and her family testified that he believed that the mother was sincere in her concern for the child and that services were available in the community and that a plan could be developed that would be beneficial to S.L.H. and *679 his mother if he were returned to his mother. We therefore conclude that less restrictive alternatives exist and that the evidence in support of termination was not sufficiently "clear, direct and weighty and convincing" to justify terminating the mother's parental rights.
Our holding with respect to the dispositional order renders moot certain of appellant's remaining contentions. Those that are not moot we find to be without merit, except that we assume that upon remand the trial court will make a suitable award of attorney fees to appellant's counsel.
The order of adjudication is affirmed. The decree of disposition is reversed, and the case is remanded for further proceedings consistent with this opinion.
FOSHEIM, C.J., and MORGAN, J., concur.
DUNN and HENDERSON, JJ., concur in part, dissent in part.
DUNN, Justice (concurring in part, dissenting in part).
I would affirm both the adjudication and the disposition.
This unfortunate child and his mother have been under the supervision of Social Services since the child's birth. He has been in and out of foster homes. The mother has been given every opportunity to improve herself. The child is now seven years old and we are still finding him to be dependent and neglected. What possible alternative is there left to explore? The disposition of the trial court should be affirmed.
HENDERSON, Justice (concurring in part, dissenting in part).
The child suffers from developmental retardation. Additionally, his eyes do not function properly, his gait is clumsy, and he suffers from imbalance causing him to constantly fall. Dr. Sam Mortimer, a qualified pediatrician, diagnosed this condition and it is supported by the observations and testimony of witnesses Hagg, Pray, and McEvoy. This is an Adjudicatory Fact and a fact which the majority opinion affirms.
The trial court further found that the retardation development resulted at least in part from developmental deprivation, especially from the acts and omissions of the child's mother. This is an Adjudicatory Fact and likewise a fact affirmed by the majority opinion.
Dr. Mortimer testified that the child suffered from environmental deprivation. Essentially, that the child was developmentally delayed in all areas and the child had not received adequate intellectual stimulation, security, and a sense of permanence. Throughout the entire case history, it is glaringly apparent that the child made no developmental progress while in the mother's care but made significant and dramatic progress while in foster care.
A startling revelation in the testimony of the mother is that she cannot recognize that there is anything wrong with the child. Therefore, it is obvious why this retarded and physically handicapped child makes no progress while in the care of the mother. The trial court found that "Notwithstanding the diagnosis of Dr. Mortimer and other experts, Respondent [mother] claims that the child is just slow and would outgrow his problems if he would just be left alone." (Emphasis supplied.) For a judicial refutation of this concept of child rearing, see In re J.M.A., 286 N.W.2d 324, 327 (S.D.1979) (Henderson, J., specially concurring). To replace this child with the mother beggars the imagination, for Finding of Fact VIII provides: "The Court finds from the psychological evaluation and testimony of Yvonne Hagg, that [the mother] shows a lack of common sense, consistent poor judgment, extremely limited maternal and nuturing [sic] qualities, and that Respondent mother habitually places her needs ahead of and superior to those of the minor child." Again, I point out that the majority opinion affirms the findings of fact below as having been supported by the clear and convincing evidence test set forth in Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
*680 The mother's poor judgment and callous disregard of the child was manifested by placing the child in a bathtub rather than a crib which was available, leaving the child alone and knocking on the neighbor's door when she decided to go out, and placing the child in foster care because the neighbor refused to care for the child. Surely, this is not the kind of mother that should be permitted to raise a mentally retarded and physically handicapped boy. Additionally, the mother has a long history of permitting the boy to be dirty and poorly clothed. It is evident that this boy needs compassion from an understanding parent, good temporal care, and physical therapy. Otherwise, he shall join those poor souls who never enjoy the simple sweetness of ordinary life.
The trial court, by way of Dispositional Finding of Fact 6, found: "Clear and convincing evidence shows that [S.L.H.], Minor, suffers from developmental retardation and developmental deprivation and environmental deprivation largely due to or aggravated by, directly or indirectly, the acts and omissions and inadequate and improper parental care, supervision, and guidance of and by the child's mother, Respondent." A psychiatric social worker testified that the mother had the potential for a psychotic break. Several experts testified that the mother had not changed significantly. Therefore the potential harm to the child was great. A further dispositional finding held that "[c]lear and convincing evidence ... requires and will require an extraordinary amount of proper care, attention, affection, supervision, guidance, and rehabilitation." Obviously, the mother cannot supply these requirements as exemplified by past performance and a resistant attitude towards future improvement.
The trial court, by clear and convincing evidence, found the least restrictive or narrowest alternative commensurate with the best interests and welfare of the child was the termination of all parental rights of the mother. Such conclusion was based, in part, upon the mother's continued lack of supervision, lack of judgment as a parent, poor hygiene, marital discord, domestic violence, perverse sexual practices, and a general failure of perception that the child was indeed mentally retarded and physically handicapped. These findings and this conclusion were not clearly erroneous. This is the proper scope of review and the majority opinion is conspicuously silent on the dispositional aspect of this case as regards that scope of review.
South Dakota provided service after service, for this mother, at great expense to the taxpayers. Examples include: foster care placement of the child, placing the mother in a foster home with the child, referral to public health, special needs day care, a parent aid, a protective payee, a homemaker, transportation for doctor appointments, medical attention, counseling, and mental health care. These services were all unavailing. The State should not be required to furnish services where it is apparent that the services will not succeed. It is wrong for South Dakota to continue, ad infinitum, teaching parenting skills to a parent who refuses to parent. In such cases, termination of parental rights is proper. See In re S.S., 334 N.W.2d 59 (S.D.1983). Testimony revealed that the mother had serious pathological personality traits and a severe personality disorder. Encharged with the responsibility of ferreting out the facts, the trial court perceived that the least restrictive alternative, from the child's point of view, was to terminate the mother's rights. In such judgment, I would affirm the trial court.
Extracting bits and pieces of testimony and facts to contradict and refute the overwhelming evidence portrayed by this action, the majority opinion impugns the Adjudicatory and Dispositional Findings of Fact. It appears the majority's basic premise is that it disputes the ultimate conclusion of the trial court, which is that this boy's "environment is injurious to his welfare." Therein, I disagree with the majority opinion.
The best interests of the child remain paramount in proceedings concerning termination of parental rights. In re M.S.M., *681 320 N.W.2d 795 (S.D.1982); In re B.E., 287 N.W.2d 91 (S.D.1979). The majority opinion focuses on the mother's rights. It is the duty of the court "at every turn to see the child is protected" for it is the welfare of the child which is the paramount consideration. In re M.B., 288 N.W.2d 773, 775 (S.D.1980). The paramount consideration of the majority opinion is the mother's rights. However, this mother's fundamental right to her child is not absolute or unconditional. In re K.D.E., 87 S.D. 501, 210 N.W.2d 907 (1973). The fundamental rights of parents must be balanced with the best interests of the child and public. In re S.H., 337 N.W.2d 179 (S.D.1983). The trial court's decision anteceded S.H., 337 N.W.2d 179. Notwithstanding, it appears to me that implicit in the trial court's decision, the trial court considered the interests of the mother, the welfare of the child, and the attendant outrage of a civilized society to the manifest mistreatment and abuse of this innocent, retarded, and physically handicapped boy. In its basic analysis, the majority opinion is in grave error for it subjects the child to potential harm and detriment. Where potential harm exists, a parent-child relationship should be discontinued. In re B.E., 287 N.W.2d 91; In re V.D.D., 278 N.W.2d 194 (S.D.1979); In re D.K., 245 N.W.2d 644 (S.D.1976). Acting under the evidence, the trial court properly determined that the child had suffered continual maternal deprivation since birth and terminated the parental rights of the mother. In re L.M.T., 305 N.W.2d 399 (S.D.1981). Therefore, I vote to affirm the trial court in toto.
Gabriela Mistral, Nobel Laureate of Chile, penned:

WE ARE GUILTY 
OF MANY ERRORS AND MANY FAULTS 
BUT OUR WORST CRIME 
IS ABANDONING THE CHILDREN, 
NEGLECTING THE FOUNTAIN OF LIFE. 
MANY OF THE THINGS WE NEED 
CAN WAIT. THE CHILD CANNOT. 
RIGHT NOW IS THE TIME 
HIS BONES ARE BEING FORMED, HIS 
BLOOD IS BEING MADE, AND 
HIS SENSES ARE BEING DEVELOPED. 
TO HIM WE CANNOT ANSWER 
`TOMORROW.' 
HIS NAME IS `TODAY.'
It is with these thoughts in mind, I write for the child, S.L.H.
NOTES
[1] The mother testified that she would plug up the faucet to the bathtub, place the crib mattress in the tub, and cover it with bedding. She testified that both she and S.L.H. had been satisfied with this arrangement.
[2] The mother testified that she had learned from the foster care placement, but that a conflict existed between the foster parents and herself because they wanted to adopt S.L.H. and wanted her out of their home. The social worker was aware of the problem and discussed it with both the mother and the foster parents. The social worker testified, "And so I guess [the mother] wasn't willing to try to work those [problems] out and so she left."
[3] The CAT scan was performed and the results were negative.
[4] We have recently recommended that the trial courts explicitly set forth this balancing process. In re S.H., supra, 337 N.W.2d at 181.
[5] She now has both a car and a driver's license.